### Rogers and another *against* Thomas.

Goods were sold by *A* to *B*, to be forwarded by railway to a certain place, and *A* sent them to the nearest depot to be thus forwarded. No fraud was practised by *B* in the purchase of the goods; nor did *A* claim to retain them for a non-compliance with the terms of sale. While the goods remained at such depot, they were attached by *C*, a creditor of *B*, as *B's* property. *A* thereupon claimed the goods, by virtue of his right of stoppage *in transitu.* *B* was insolvent when the goods were stopped, but did not become so after the sale; there having been no change in his circumstances, for several years

*New-London,*
July, 1849.

Rogers
*v.*
Thomas.

prior thereto. Still *A* had no knowledge of *B's* insolvency at the time of the sale, notwithstanding the use of ordinary diligence on the part of *A*, to ascertain *B's* circumstances. In an action of trover brought by *A* against *C*, it was held, 1. that neither the want of such knowledge, nor the use of such diligence, affected the right claimed by *A*; 2. that an essential requisite of such right is the insolvency of the vendee, consisting not merely of a general inability to pay his debts, but in his having taken the benefit of an insolvent law, or a stoppage of payment, or a failure in his circumstances, evinced by some overt act; 3. that in order to confer this right, it is not sufficient that the requisite insolvency exists at the time of the sale, but it must intervene between that time and the exercise of the right; consequently, that the right did not exist in this case. [One judge dissenting.]

THIS was an action of trover, for a quantity of lumber; tried at *New-London,* on the general issue, *September* term, 1849.

The plaintiffs claimed to have proved, that they sold the lumber described in the declaration, to *Edward C. Moulton,* a house carpenter and builder, who purchased it to be used in the construction of an academy at *Danielsonville,* on which he was engaged; that the lumber was to be transported thither on the *Norwich and Worcester Rail-road,* and was taken from the lumber-yard of the plaintiffs in *Norwich* to the rail-road depot in that city, by a carman employed by the plaintiffs, for the purpose of being so forwarded; that while it remained there for this purpose, the defendant, being a deputy sheriff, attached it as the property of *Moulton,* by virtue of a lawful writ of attachment against him, and proceeded to dispose of it according to law. The plaintiffs further claimed to have proved, that at the time of such attachment by the defendant, *Moulton* was a bankrupt and insolvent; and they insisted, that not having been paid for the lumber, they had a right to stop it in its transit to *Danielsonville,* where, as they claimed, they were to deliver it.

The defendant denied the bankruptcy and insolvency of *Moulton,* and that the delivery of the lumber was to be at *Danielsonville,* claiming that it was to be delivered at *Norwich.*

The court submitted these questions as to the bankruptcy and insolvency of *Moulton,* and as to the place of delivery, to the jury, as questions of fact.

It was not claimed by the plaintiffs, that *Moulton* became bankrupt or insolvent after the sale of the property to him

and prior to the attachment; nor was there any evidence that there had been any known change in his pecuniary condition or circumstances, for several years; or that the plaintiffs had any knowledge of his insolvency, at the time of the sale to him. The defendant claimed, and prayed the court to charge the jury, that if the purchase of the lumber by *Moulton,* was fairly made, and there was no change in his circumstances, after the sale and before the attachment, the plaintiffs had no right to stop the property *in transitu,* and the verdict should be for the defendant.

The court did not so charge the jury.

The defendant further claimed, and prayed the court to charge the jury, that if they should find, that *Moulton* was a bankrupt and insolvent, at the time of the sale, the plaintiffs were bound to prove, that they made some enquiry, either of *Moulton,* or of some other person, in regard to his pecuniary responsibility, and that these enquiries were answered favourably to his responsibility; or that some representations were made to them, inducing the belief that *Moulton* was of ability to pay for the lumber; or else, that it would be taken as against the plaintiffs, that they sold the lumber, knowing *Moulton's* circumstances, and so they would have no right to stop the property *in transitu.*

The court did not so charge the jury; but charged them, that if *Moulton* was a bankrupt or insolvent when the lumber was sold to him, and the plaintiffs had no knowledge of any such bankruptcy or insolvency, they would have the right to stop the property, at any time before it reached *Moulton's* hands; and though the plaintiffs were bound to exercise ordinary care and diligence, yet they were not bound to shew, that they made any enquiry as to the circumstances of *Moulton,* or that any representations were made to them touching his responsibility, in order to rebut any presumption that they had knowledge of his circumstances, at the time of the sale.

The jury returned a verdict for the plaintiffs; and the defendant moved for a new trial for a misdirection.

*Foster* and *Judson,* in support of the motion, contended, 1. That in the absence of any fraud or misrepresentation, by which credit is obtained, on the sale of personal property,

*New-London,* the insolvency of the vendee, accruing *after* the sale, is an
July, 1849. essential requisite to the right of stopping *in transitu.* 2
Rogers *Kent's Com.* 540. 543. 493. *Abbott* on *Ship.* 411. 155.
*v.*
Thomas. *Chitt. Cont.* 125. *Cross* on *Lien,* 1. 363. 365. *Long on
Sales,* 168. 170. *Dutton* v. *Solomonson,* 3 *Bos. & Pul.* 582.
*King* & al. v. *Meredith,* 2 *Campb.* 639. *Stephens* v. *Wil-
kinson,* 2 *B. & Adol.* 320. (22 *E. C. L.* 86.) *Bloxam* & al.
v. *Sanders* & al., 4 *B. & Cress.* 941. (10 *E. C. L.* 477.)
2 *Selw. N. P.* 1285. (*Wheat.* ed.) *Kinloch* v. *Craig,* 3
*Term R.* 122. *Ellis* v. *Hunt, Id.* 467. 459. *Stubbs* v.
*Lund,* 7 *Mass. R.* 453. *Bromley* v. *Bigelow,* 12 *Pick.* 313.
*The People* v. *Haynes,* 14 *Wend.* 562, 3. *Vertue* v. *Jewell,*
4 *Campb.* 31. 1 *Smith's Lead. Cas.* 270.

2. That where no change occurs in the circumstances of
the vendee after the sale, it is incumbent upon the vendor to
show, that some representations were made, which induced
him to give the credit ; or at least, that he used ordinary dil-
igence in making the sale ; otherwise, the presumption will
be, that he was aware of the circumstances of the vendee ;
and he cannot stop the goods *in transitu.*

*Strong* and *E. Perkins,* contra, contended, 1. That the
vendor's right to stop the goods *in transitu,* depends on the
fact of the vendee's insolvency *when the right is exercised—*
not upon whether that insolvency occurred after or before
the purchase. *Chitt. Cont.* 431. *Cross on Lien,* 231.
*Buckley* v. *Furness* & al. 15 *Wend.* 137. 141. *S. C.* 17
*Wend.* 504. In the first place, any rule defeating this right,
where the insolvency existed prior to the purchase, would
change this great equitable right into a convenient shield for
fraud. Secondly, the concealment, in this case, by *Moulton,*
of his insolvency, was a fraud on the plaintiffs, which cer-
tainly cannot give to him, or his creditors, any greater equi-
ties than existed when the sale was made, under an honest
mistake as to the ability of the purchaser.

2. That the charge of the court, that the plaintiffs were
not bound to prove that they made some enquiry as to the
circumstances of *Moulton,* was correct. In the first place,
there is no rule of law requiring the vendor, in a case like
this, to prove his *ignorance* of the insolvency of the vendee
at the time of sale. Secondly, the presumption of common

sense and the law alike would be, that the vendor parted *New-London,*
July, 1849. with his property, in the belief that the vendee was of ability to pay for it. Thirdly, the facts found by the motion in this case to have been in evidence to the jury, are abundantly sufficient to rebut any presumption of knowledge in the plaintiffs of the insolvency of *Moulton,* without further evidence.

Rogers
*v.*
Thomas.

STORRS, J. The question here presented, is, whether the plaintiffs had a right to exercise the right of stoppage *in transitu* as to the goods for the conversion of which this action is brought : if they had, there is no doubt that, by doing so, they acquired a title to the property, which would prevail against the attachment of it, by the defendant, on behalf of a creditor of the vendee.

It is material to observe, that this case is quite distinguishable from those cases in which a vendor of goods retains them, in consequence of a fraud having been practised by the vendee, in the purchase of them ; and also from those, where he detains them, by reason of a non-compliance by the vendee with some stipulation in the contract of sale, the performance of which constituted a condition precedent to the consummation of it. In the first of these cases, the delivery of the goods is refused or countermanded, on the ground that the vendor rescinds the contract of sale, as he undoubtedly may, for that cause : he retains or resumes it, on the sole ground of his original ownership, the vendee never having acquired any rights whatever in it. In the other of these cases, also, the property in the goods, remains in the vendor until the performance of the stipulated condition, on which he was to be divested of it : and consequently, he is, in this respect, in the same situation as the vendor in the other case, after he has rescinded the sale. Neither the right of property nor of possession, has ever been transferred, absolutely or qualifiedly, in either of these cases ; and nothing has taken place to affect, in any respect, the original rights of the vendor. In the last case, the vendee may have a right, by a performance, on his part, of the condition on which his title was to depend, to compel the vendor to execute the contract, the effect of which would be, to vest the title in the vendee ; but until that is done, the title remains in the vendor, and is unaffected, by anything which

has taken place. In the other, the right of the vendor to rescind the contract and reclaim the goods, does not cease when the vendee has obtained even actual possession of them, but may be exercised at any time after the vendor has parted with the possession, and whether they are in the hands of the vendee or of any other person, excepting one to whom they have been transferred by the vendee, *bona fide*, and for a valuable consideration, advanced or given on the strength of them. The right of stoppage *in transitu*, however, never applies to any cases, excepting those, where by a sale, the right of property passes to the vendee, and also the right of possession, (subject to be defeated only by the exercise of that right,) and can never be exercised after the property has come to the actual possession of the vendee. In this case, it would not have been competent for the plaintiffs to countermand the goods in question, while they were on their way to the vendee, on the ground that any fraud had been practised in the purchase, or that anything remained to be done by the vendee, in order to entitle him to them ; since there is nothing in the case to shew, nor was it claimed, when they were stopped, or on the trial, that such was the case. There is also this essential difference between the effect of a stoppage *in transitu*, and a reclamation of property after a sale, on the ground of fraud. The effect of the former is, merely to retain it in the hands of the vendor, as the property of the vendee, as security for the price for which it was sold ; in which case, the latter may put an end to the right of the former, by payment or a tender of the price. It does not indeed appear to be precisely settled, whether the exercise of the right of stoppage *in transitu* operates as a rescission of the contract of sale, although the better opinion in *England* and this country undoubtedly is, that it does not, but only to give to the vendor an equitable lien on the property. But, however this may be, it appears to be clear, that the vendee may, on payment or tender of the price, claim the possession of the property. But the effect of reclaiming the property for a fraud in the sale, is wholly to rescind the contract, and put an end to all the rights of the purchaser under it. The plaintiffs have made no claim that the property in question did not pass to the vendee, by the contract of sale ; and they have placed

their right to recover, on the sole ground that the law of
stoppage *in transitu* applied in favour of their right to re-pos-
sess themselves of it, after it had left their possession and
while it was on its way to the vendee.    Independent of the
principle, which prevails under that branch of the law, by
which the vendor of goods may, in case of the bankruptcy
or insolvency of the vendee, reclaim the possession of them,
there is no principle, by which, after a sale of property, by
which the title to it and right of possession have been trans-
ferred to another, the vendor may resume the possession of
it ; and under the law of stoppage *in transitu,* such right of
resumption is limited to cases of the vendee's bankruptcy or
insolvency.

In this case, the facts, as found, are, that the vendee was
insolvent when the goods were stopped by the plaintiffs, but
that he did not become insolvent after the sale ; and that
there had not been any actual or apparent change in his
pecuniary condition, for several years prior thereto, although
the plaintiffs had no knowledge of such insolvency until after
the sale, notwithstanding the use of ordinary care and dili-
gence on their part in ascertaining the circumstances of the
vendee ; and the question is, whether the right of stopping
the goods attached in favour of the plaintiffs, while they
were on their way to the latter.

We do not think that the want of such knowledge, or
the use of such diligence, has any material bearing on this
question.   We find no case where the right of reclaiming
property after a sale, by reason of the insolvency of the
vendee, has been claimed or held to attach, on the ground
that the vendor was ignorant of such insolvency when the
sale took place ; or where such right has been held to de-
pend on the degree of diligence used by the vendor, in
ascertaining the vendee's pecuniary condition.    But in every
case which has fallen under our notice, it has been made to
depend on the existence of the fact of bankruptcy or insol-
vency in the vendee, irrespective of these circumstances.
In the text-books, where principles are often stated very
loosely, we sometimes find expressions, which, if understood
literally, and without being collated with the cases to which
they refer, seem to intimate, that the mere discovery
of the bankruptcy or insolvency is the circumstance which

confers the right of reclaiming goods sold ; but when those cases are examined, it is obvious, that they support no such idea, and that nothing more was intended than that, when such bankruptcy or insolvency had taken place, and it was discovered by the vendor, he had a right to seize the goods. Common prudence would naturally induce a person to enquire respecting the circumstances and character of one whom he was called on to trust ; but if by the answers to such enquiries, he should be led to place a false confidence in the person who was the subject of the enquiry, and thereby suffers, the consequence must be borne by himself, unless a fraud has been practiced on him. The rights of the vendee, to whom he had given credit on the strength of such information, such vendee having been guilty himself of no fraud, would not be varied, by the circumstance that the vendor had been misled, whether innocently or fraudulently, by a third person. The plaintiffs' ignorance of *Moulton's* situation, and their diligence in ascertaining it, should therefore be laid out of this case. Nor is it claimed, that the attachment of this property, in a suit against the vendee, by one claiming to be his creditor, previous to the seizure of it by the plaintiffs, constituted any such change in the situation of the vendee as to confer the right of stoppage *in transitu*, if such right did not otherwise exist.

This case, thus disembarrassed from facts which are unimportant, presents two enquiries : 1. What is to be understood by the term, *insolvency*, when it is used to denote the situation of a vendee of goods, which confers on the vendor the right of stopping them *in transitu* ? 2. At what time must such insolvency occur, in order to authorize the exercise of such right ?

Although we think that a solution of these questions is involved in several of the reported cases on this subject, we have been not a little surprised at finding none in which they are directly or pointedly answered ; which confirms the remark of Lord *Abinger*, in *Gibson* v. *Caruthers*, 8 *M. &. W.* 337. that " although the question of stoppage *in transitu* has been as frequently raised as any other mercantile question, within the last hundred years, the principle on which it depends (and, he might have added, the exigency on which the right may be exercised,) has never been either settled, or

*New-London,*
July, 1849.

———

Rogers
*v.*
Thomas.

stated in a satisfactory manner." Considering it, according to the best opinions, as a part of the law merchant, introduced, in comparatively modern times, into and now forming a part of the common law, we are, therefore, in determining the questions before us, left to rely on the course and effect of the decisions on this branch of the law, which were presumably intended to follow the practice of the mercantile community, rather than on any abstract reasonings.

The cases on this subject generally mention insolvency as one of the conditions on which the right of stoppage *in transitu* accrues ; but they are wholly silent as to what constitutes such insolvency ; and therefore its sense, as thus used, is to be gathered from the circumstances of the cases. For it is a term which is used with various meanings. In a technical sense, it denotes the having taken the benefit of an insolvent law ; in the popular sense, a general inability to pay debts ; and in a mercantile sense, a stoppage of payment, or failure in one's circumstances, as evinced by some overt act. That a technical insolvency is sufficient to authorize the exercise of the right of stoppage *in transitu,* has always been conceded. That it is not indispensable for that purpose, is equally clear. Mr. *Smith,* in his *Compendium of Mercantile Law, p.* 549. *n.* expresses his belief, that merchants have very generally acted as if the right to stop goods was not postponed till the occurrence of insolvency in the technical sense, and pertinently adds, " The law of stoppage *in transitu* is as old, it must be recollected, as 1670, on the 21st of *March,* in which year, *Wiseman* v. *Vandeput* was decided ; so that, if *insolvency* is to be taken in a technical sense, the law of stoppage *in transitu* has been varying with the varied enactments of the legislature regarding it."

That stoppage of payment amounts to insolvency for this purpose, is assumed in many of the cases. Lord *Ellenborough,* in *Newson* v. *Thornton,* 6 *East,* 17. places the right of the vendor to stop the property, on the " *insolvency*" of the consignee, where there had been only a stoppage of payment by the vendee, when notice was given to the carrier, by the vendor, to retain the goods. In *Vertue* v. *Jewell,* 4 *Campb.* 31. the terms used, were " stopped payment." See also *Dixon* v. *Yates,* 5 *B. & Ad.* 313. We

*New-London,*
*July, 1849.*

Rogers
*v.*
Thomas.

have been able to find no case in which the right of stoppage *in transitu* has been either sanctioned or attempted to be justified on the ground of the insolvency of the vendee, where there was not a technical insolvency, or a stoppage of payment, or failure in circumstances, evidenced by some overt act ; and Mr. *Blackburn*, in his *Treatise on the Contract of Sale, p.* 130. where this subject is very minutely examined, says, that there seems to have been no such case ; and adds, that although the text-books and *dicta* of the judges do not restrict the use of the term, " insolvent," or " failed in his circumstances," to one who has stopped payment, there must be great practical difficulty in establishing the actual insolvency of one who still continues to pay his way ; and as the carrier obeys the stoppage *in transitu* at his peril, if the consignee be in fact solvent, it would seem no unreasonable rule to require, that at the time the consignee was refused the goods, he should have evidenced his insolvency by some overt act.   Mr. *Smith,* in his work which has been mentioned, clearly favours the same view.   *Comp. Merc. Law,* 130. *n.*   Hence it appears, that the authorities and text-writers furnish no support to the claim, that a mere general inability to pay debts, unaccompanied with any visible change in the circumstances of the debtor, constitutes insolvency, in such a sense as to confer the right of stoppage *in transitu.*

The argument from this source, against such a claim, is much stronger than a merely negative one derived from a want of authority in its support.   When it is considered that this branch of the law is founded on the custom of the mercantile world, and that during the last 170 years, during which the right of stoppage *in transitu* has been recognized, numberless sales on credit must have taken place, where there would have been occasion to exercise it, if it would have been allowed where there was merely a general inability, on the part of the vendee, to pay his debts when the sale was made ; the fact that it does not appear even to have been attempted, shews almost conclusively, the universal sense of the mercantile community and of the legal profession, that it would not be permitted in such cases.   It cannot be believed, that the question would have been, at this day, one of the first impression.   To say nothing of the incon-

venience that would ensue from permitting the right to rest upon the result of an enquiry, perhaps very complicated, into the whole state of the vendee's circumstances, including the amount of his liabilities on the one hand, of his assets on the other, in which not only the ordinary evidence to shew his situation might be introduced, but he might be required to disclose the whole state of his affairs, and this only for the purpose of justifying a detention of his property, we are, by no means satisfied, that justice to himself, or the general interests of commerce would be promoted, by allowing such an enquiry for this purpose. His credit might stand entirely fair ; and by means of that credit, he might, in the regular course of business, have a reasonable prospect of retrieving himself from embarrassment ; while such an investigation, whatever might be its result, would necessarily have the effect, in many, if not in most cases, to cripple, if not to ruin him in his business, and oftentimes would render one insolvent, who was not so before. We think, therefore, that in order to authorize a stoppage *in transitu*, there should be some ostensible and certain criterion, by which the insolvency of the vendee may be ascertained ; and that it should consist of some visible change in his pecuniary situation,— some open, notorious act on his part, calculated to affect his credit,—some change in his apparent circumstances, which would operate as a surprise on the vendor, and which, if he had known, he would not have given credit to the vendee.

The remaining enquiry respects the time when such insolvency must occur, in order to confer this right. On this point, we are of opinion, that it is not sufficient it exists when the sale takes place, but that it must intervene between the sale and the exercise of such right. It is well settled, that after the sale and before the vendor has taken any steps to forward the property to the vendee, the former has a lien upon it, by virtue of which he may, on the occurrence of the insolvency of the latter, retain the goods in his possession, as a security for the price. This is a strictly analogous right to that of stopping them after they have been forwarded, and while they are on their way to the vendee, and depends on the same principles. And it may be here remarked, that the cases decided on the subject of that right of

*New-London,*
July, 1849.

Rogers
*v.*
Thomas.

*New-London,*
July, 1849.

Rogers
*v.*
Thomas.

lien, confirm the views which we have expressed as to the meaning of insolvency as applied to the right of stoppage, after the *transitus* has commenced. The same equitable principle, which authorizes a retention of the possession, in the one case, and a recovery of it, in the other, would seem to authorize the latter, where the insolvency occurred after the sale and before the forwarding of the property. The right of stopping it after the *transitus* has commenced, may not, therefore, be limited to the case where insolvency occurs after it has left the possession of the vendor, but may extend to cases, where it occurred at any time after the sale. However that may be, we are clear that it must occur after the sale. In favour of this position, there is the same argument from an entire absence of authority against it, as was derived from that source, on the point which we have just considered ; and it applies with equal force. We find no decided case, in which the right in question has been sanctioned, excepting where the insolvency occurred subsequent to the sale. And although the language of the courts may sometimes seem to import, that the right exists, irrespective of the time when the insolvency took place, it is quite plain, that applying their expressions to the cases they were considering and which did not involve this point, they were not intended to have that construction. But in most of the decided cases on this subject, it will be seen, that their language is most unequivocal, and in terms limits the right of stoppage to cases of bankruptcy or insolvency, occurring while the goods are *in transitu*, and of course after the sale.

But little aid is derived from the text writers on the point now before us. They usually merely transcribe the language of the judge giving the opinion of the court in the case to which they refer, without reciting the facts on which it was pronounced ; and precision is not to be expected where the question has not directly arisen. We discover in their works no instance, in which it is stated in terms, that the insolvency of the vendee may happen previous to the sale ; in several, it is laid down in terms, that it must occur while the goods are *in transitu ;* in most of them, the most natural and obvious import of their language is, that it must take place before the sale ; *and in all* of them, it is consistent with this construction. Mr. *Smith,* one of the most learned,

exact and authoritative expositors of law, is, however, very <span style="float:right"></span> explicit on this subject, and states the doctrine on this point, with a precision that admits of no doubt as to his opinion upon it. He, in terms, limits the exercise of the right of stoppage *in transitu* to those cases, where "goods are consigned on credit, by one merchant to another, and it happens that the consignee *becomes* bankrupt or insolvent, *while the goods are on their way to him,* and before they are delivered." *Comp. Merc. Law,* 547. *Oliver's Law Sum.* 116.

The extension of the right of stoppage *in transitu* to cases where the vendee was insolvent at the time of the sale, has been urged, by arguments drawn from the effects of restricting it, and also from the reasons on which it was originally allowed. It is said, that, to restrict it, would operate as a fraud on the vendor. That the purchase of property, by one insolvent at the time, without his informing the vendor of that fact, and the latter being ignorant of it, would, of itself, necessarily constitute a fraud, will not be claimed. The purchaser might not be aware of the fact: and if he were, the case of *Cross* & al. v. *Peters,* 1 *Greenl. R.* 376., is a very respectable authority to show, that a mere omission to reveal it to the vendor, would not be a sufficient ground for the latter to avoid the sale, on the ground of fraud. The court there say, that in the commerce and intercourse of mankind, an implication that the purchaser is sound in his pecuniary concerns, was never understood to exist. While the law already amply protects the vendor against any fraud by the purchaser, it seems to us, that, in the absence of it, it is more safe and expedient to leave the vendor to the ordinary means of acquiring the requisite information as to the vendee's circumstances, and to the securities which it is in the power of the vendor to require, than to protect him, to the extent claimed by the plaintiffs, against the consequences of his own indiscretion.

It is further said, that credit is always presumably given under a belief of the solvency of the purchaser. Other considerations, however, frequently influence the vendor; and it is by no means unusual to give credit to those who are known to be unable to pay the debt, unless from the avails of the property sold to them, under a reliance on their integrity and skill in business.

*New-London,*
*July, 1849.*

Rogers
*v.*
Thomas.

But, as already suggested, the right of stoppage *in tran-situ* does not proceed on the ground of fraud in the vendee, but, on the contrary, supposes the title to the property to be fairly vested in him; and the exercise of that right affirms that title, and only sets up a right to retain the possession of it as a security for the price.

It is urged, that the reasons which give this equitable right, apply equally, whether the insolvency occurs before or after the sale. This argument, however, goes too far, unless the rule, as established, is to be entirely disregarded. On the same ground, it might be claimed, that the right should not cease after the vendee had obtained actual possession of the property. But the subject which we are considering, is not one with which we are at liberty to deal on such general considerations. Stoppage *in transitu,* as has been justly remarked, stands alone in our law, and is founded in strict justice. Per *Gurney,* B. *Gibson* v. *Caruthers.* It was introduced and adopted into the common law, of which it originally formed no part, not in analogy to any of its principles, but for the benefit of trade, as a part of the *lex mercatoria,* and therefore founded on the custom of merchants, and was designed to be co-extensive with that custom. It is applicable only to an isolated class of cases, and although highly favoured as to them, was not designed to be extended, as a general doctrine, applicable to others. We have no evidence that the practice of the mercantile community in regard to detaining or arresting goods bought on credit, ever extended to a case like the one before us; and no such custom is recognized, by the adjudications on the subject. Whether the principle on which this branch of the law rests, might not be beneficially and safely extended, we do not feel called on to enquire. We are content to take the law on this particular subject as we find it, without assuming the responsibility of applying the anomalous principle on which it is founded, to cases which must have frequently arisen, but to which it has never been heretofore considered applicable, or of introducing it now, for the first time, as a universal principle of the common law.

The charge below, not being in accordance with these views, we think that a new trial should be granted.

New-London, July, 1849.

Rogers
v.
Thomas.

In this opinion, CHURCH, Ch. J., and HINMAN and ELLSWORTH, Js. concurred.

WAITE, J. On the trial of this cause in the court below, the defendant claimed, that if the purchase was fairly made by *Moulton*, and there was no change in his circumstances, between the sale and the attachment, the plaintiffs had no right to stop the goods *in transitu*. This claim was not sanctioned by the court; and the jury were instructed, that if the vendee was insolvent, at the time of the purchase, and the vendors had no knowledge of such insolvency, they had a right to stop the goods, at any time, before they reached the hands of the vendee.

This part of the case presents the single question, whether it is necessary for the vendor, before he can legally exercise the right of stopping the goods, to prove a *change* in the circumstances of the vendee, between the time of sale and the stoppage of the goods; or whether it is sufficient for him to show, that he sold in good faith, relying upon the ability of the vendee to pay, and that before the goods got into his possession, he *discovered* that the vendee was insolvent, and thereupon stopped the goods.

My brethren are of opinion, that this claim of the defendant is well founded, and the charge wrong, and, upon this point alone, grant a new trial. After a careful examination of all the cases within my reach, I find myself unable to concur in that opinion; and as the question involved is one of great practical importance in the mercantile community, I feel it to be my duty briefly to assign the reasons for thus differing from them.

Not a case have I been able to find in the books, which, either directly or indirectly, militates against the charge; but, on the contrary, as it seems to me, it is both in harmony with the whole current of authorities, and in strict accordance with the equity of the case.

The right of stopping goods *in transitu,* as has been often said, was originally introduced into the common law, from courts of equity, and has become so firmly established, by

such a variety of decisions, that it is now no longer regarded, by courts of law, as a mere equitable right, but is justly considered as coming within the spirit and principles of the common law, as a kind of equitable lien, adopted for the purpose of substantial justice. *Tucker* & al. v. *Humphrey,* 4 *Bing.* 516. (15 *E. C. L.* 64.) *Hodgson* v. *Loy,* 7 *Term R.* 440. 445. *Hammond* & al. v. *Anderson,* 1 *Bos. & Pul. N. R.* 69. It is, says Chief Justice *Shaw,* "nothing more than an extension of the right of lien, which by the common law the vendor has upon goods for the price, originally allowed, and subsequently adopted, as a rule of law." *Rowley* v. *Bigelow,* 12 *Pick.* 313. And so favourably has the rule been viewed, that eminent judges, instead of manifesting a desire to narrow its operation, have expressed their regret, that it was not in their power to give it a more extended application, and authorize the vendor of goods, in case of the bankruptcy of the vendee, to follow them even into the hands of the bankrupt and his assignees. *Inglis* & al. v. *Usherwood,* 1 *East,* 515. *Scott* & al. v. *Pettit,* 3 *Bos. & Pul.* 469. These cases are alluded to, for the purpose of showing the present leaning of courts of justice upon this subject—"a leaning," says Lord *Kenyon,* "to the furtherance of justice." *Northey* & al. v. *Field,* 2 *Esp. R.* 614.

The rule to be extracted from all the cases, I take to be this :—If the vendee becomes insolvent before the goods are actually received by him, the vendor may stop them *in transitu.* And it is immaterial at what time the insolvency commenced, or how long it existed, provided it was unknown to the vendor, at the time of sale. If indeed a man sell goods to another, *knowing* him to be insolvent, the fact of insolvency will give him no right to rescind or vary a contract which he has understandingly made. But the case is altogether different, when the vendor has no knowledge of that insolvency. "Every man," says Lord *Kenyon,* "contracting to supply another with goods, acts on the presumption that that other is in a situation to pay for them ; and therefore, when the condition of the consignee is altered, at the time of delivery, and he is insolvent, and no longer capable of performing the contract himself, honesty and good faith require that the contract should be rescinded." *Inglis* & al. v. *Usherwood,* 1 *East,* 523. And for myself, it is difficult to see, why the

requirements of honesty and good faith should not operate as

powerfully, where a purchaser conceals from the vendor his
insolvency, and thereby obtains his property, as where he
subsequently becomes insolvent. And if, in the latter case,
the vendor can retake his goods, I am unable to understand,
why he may not do it, in the former. It is true, in the sale
of his property, he is required to exercise ordinary care and
diligence in ascertaining the solvency of the vendee; other-
wise, he will be considered as standing in the situation of a
person selling with a knowledge of the vendee's insolvency.
And so the jury were, in effect, instructed, in the present case.

The word, "insolvent," as used in the law upon this subject,
means nothing more than a general inability to pay, and not
the taking the benefit of any act for the relief of insolvent
debtors. *Biddlecombe* v. *Bond,* 4 *Adol. & Ell.* 332. (31
*E. C. L.* 80.) *Abbott on Ship.* 511. *n.*

This insolvency often steals upon a man so gradually as
to be unnoticed by his neighbours, and sometimes by himself;
and it frequently may be impossible to determine, at what
precise time he passed from a state of solvency to that of
insolvency. He may, by an erroneous valuation of his prop-
erty, deem himself able to meet all his engagements, when,
in truth, it would be impossible for him to sell that property
for a sum sufficient to pay his debts.

To require the vendor, in such cases, to prove *a change*
in the vendee's circumstances, between the sale and the
stopping of the goods, usually a very short period, would
often entirely defeat the operation of a highly equitable rule
of law.

The rule, as laid down by Chief Justice *Gibbs,* in the case
of *Litt* v. *Cowley,* seems to be directly in point, and fully
sustains the charge of the court below. 1 *Holt's, N. P. Ca.*
238. (3 *E. C. L.* 122.) *S. C.* 7 *Taun.* 169. (2 *E. C. L.*
64.) There, in *November,* 1815, goods were ordered from
the plaintiffs, who, on the 9th day of *December* following,
delivered them to carriers, to be conveyed from *Manchester,*
to the vendees in *London.* Two days afterwards, *they were
informed* that the vendees were insolvent; and thereupon
they sent an order to the carriers to stop the goods, and not
deliver them to the vendee. This order was disregarded,
and the goods delivered on the 23rd day of *December.* On

the 19th day of *January* following, a commission of bankruptcy issued against the vendees, and their assignees took possession of the goods. In an action of trover brought by the vendors, *Gibbs*, Ch. J. said, "It has never been doubted but that the goods vested in the vendee, as soon as they left the original owner's possession; but it has always been equally certain, that the owner might retake them in their passage, by any means short of felony, *if he had subsequent grounds for believing*, that the purchaser would not perform his part of the contract, by paying for them."

Here there was no pretence of any change in the circumstances of the vendees, between the time of sale and the stoppage of the goods—certainly, none between the delivery to the carriers and the order to stop them, a period of only two days. And yet the learned judge placed the plaintiffs' right of stoppage solely upon the ground of their subsequently *discovering* that the purchasers were unable to pay for the goods—a fact sufficiently evinced, by the circumstance, that in less than two months afterwards, a commission of bankruptcy was issued against them. It is true, the precise question made in this case, was not raised in that; but it is hardly possible to believe, that if it were entitled to any consideration, it should have escaped the notice of so able a lawyer as *Best*, who argued the cause both on the circuit and in the court above, and who was himself afterwards Chief Justice of that court; or that the able judge before whom the cause was tried, should have laid down the rule in so broad and comprehensive terms.

And in a more recent case, when the right of stoppage was set up, by way of defence, it appeared, that the goods were invoiced on the third of *April*, shipped on the 5th, and an order issued to stop them on the 19th of the same month. To prove the insolvency of the purchaser, a letter written by him, dated the 5th of *April*, was put in, in which he expressed himself to be insolvent in pretty plain terms. A clerk of certain bankers was called, to prove, that the bankers began to dishonour his bills as early as the 20th of *March*, and dishonoured twenty-five of them in a few days. And finally, it was proved, that a commission of bankruptcy issued against him, in the month of *November* following. The defence was conducted, by *Vaughan*, Serj.; and who will

believe that he would have pursued so suicidal a course as to call a witness to prove the insolvency of the purchaser previous to the purchase, had he believed, for a moment, that such evidence would have been fatal to his clients' cause ? The whole course of proceeding, in that case, shows the views of the court and counsel. They deemed it necessary to prove the condition of the vendee, when the goods were stopped ;—and for that purpose, evidence was introduced, showing his condition, both before the purchase and subsequent to the stoppage, for the mere purpose of enabling the jury to determine his condition at the latter period.

The same view seems to have been taken of this subject, by the supreme court of *Massachusetts.* "It is," says Chief Justice *Parker,* "objected to the exercise of this right, that the consignee did not become insolvent until after the arrival of the goods ; by which is supposed to be meant, that his insolvency was not *known or declared.* But we do not see how this can affect the question. We do not find, that the right of stopping depends upon a *declared insolvency,* or open bankruptcy, before the arrival of the goods. It is enough that the affairs of the consignee are so involved, that he is unable to pay for the goods, if he was to pay on delivery, or that he has become actually insolvent before he shall have taken possession. *Naylor* & al. v. *Dennie,* 8 *Pick.* 198. 205. And again, says Chief Justice *Shaw,* "the consignees have a right to judge for themselves of the danger of such insolvency, and to take measures to guard against it, by stopping the goods *in transitu,* should the insolvency occur before the goods came into the possession of the consignees." *Stanton* v. *Eager,* 16 *Pick.* 474.

So in *Patten* & al. v. *Thompson,* 5 *Mau. & Selw.* 368., *Holroyd,* J., said, he thought it clear, that the plaintiffs had a right, upon *hearing* of the insolvency of the *Dublin* house— the consignees in that case—to take measures for stopping the consignment *in transitu.*

In all these cases, this right is considered as depending upon the insolvency, at the time of the stoppage, without any reference whatever to the time of its commencement, or the manner in which it is to be proved ; and the vendors are entitled to the exercise of that right, upon *discovering* that insolvency. One mode of showing that, among mercantile

*New-London,* men, is, by proving that the purchaser stopped payment.
July, 1849. *Dodson* v. *Wentworth,* 4 *Man. & Gran.* 1080.    (43 *E. C.*
Rogers *L.* 555.)    *Jackson* v. *Nichol,* 5 *Bing. N. C.* 508.    (35 *E.*
*v.* *C. L.* 202.)    But that is not the only mode, as a reference to
Thomas. the cases will abundantly show ; nor is it always conclusive,
because it may have arisen from a mere temporary embar-
rassment, or disappointment, and not from a general inability
to pay.

How then stands the present case ? The plaintiffs, without
any want of care or diligence on their part, sold a quantity
of lumber to *Moulton,* believing, at the time, that he was
solvent.    While the lumber was on its way to the vendee, it
was attached, by the defendant, upon writs in favour of other
creditors of *Moulton.*    The plaintiffs, discovering the insol-
vency of *Moulton,* retake the goods, and while in their pos-
session, they are again taken by the defendant, and applied
in payment of the debts due the creditors in those suits.

The question now is, which has the superior equity, these
plaintiffs, or the attaching creditors of *Moulton ?*    It is con-
ceded, on all hands, that if *Moulton* was solvent, at the time
of the purchase, and became insolvent before the goods were
stopped, by the plaintiffs, their title would be perfect ; and
the attachment would not avail the other creditors.    So far
as the equity of the case is concerned, it is just as strong in
favour of these plaintiffs, whether the purchaser was solvent
or insolvent, at the time of the purchase, provided that insol-
vency was concealed from them.    If, as Chief Justice *Shaw*
says, "the right of stoppage *in transitu,* is but an extension
of the lien of the vendor, for the price," it may apply, as
well in the one case, as in the other.    If, as other judges have
repeatedly said, there is a disposition on the part of courts to
*extend* rather than *narrow* the application of this rule, why
not apply it to a case like the present, coming so manifestly
within the equity and spirit of the rule ; especially, when
such an application, if not clearly supported by the authority
of adjudged cases, is opposed to no decision, nor, as far as
my researches have extended, to any *dicta* of any judge ?
For myself, I am unable to see any reason for the distinc-
tion ; and therefore, cannot advise a new trial.

New trial to be granted.