ALBANY,
Jan. 1836.

## BUCKLEY *vs.* FURNISS & STICKNEY.

Where a party, residing at a distance from his correspondent, ordered a quantity of merchandize, directing it to be forwarded to an intermediate place, and the goods were accordingly forwarded; and after their arrival at the intermediate place were delivered to a common carrier employed by the purchaser, and before reaching the residence of the purchaser, the vendor resumed the possession on the ground of the *insolvency* of the purchaser; *it was held* that the goods not having arrived at the place of their *final destination*, the *transitus* was not ended, and the vendor had the right to stop and retain them until their price was paid.

The delivery of goods sold on credit, to a carrier for the *mere purpose of conveyance* to the vendee, does not divest the vendor of the right of stoppage *in transitu;* he may notwithstanding exercise such right, provided he does so before the goods come to the *actual possession* of the purchaser, or are placed under circumstances equivalent to actual possession.

*It seems*—Delay in the exercise of the right is no objection, provided the possession be resumed before the *transitus* is at an end.

So also *it seems* that the right of stoppage *in transitu* is not divested by the goods being seized or levied upon by virtue of an attachment or execution at the suit of a creditor of the purchaser, where the right is exercised by the vendor before the *transitus* is at an end.

So also *it seems* that a vendor is not entitled to exercise the right of stoppage *in transitu*, if at the time of the sale of the goods he *knows* the purchaser to be *insolvent.*

THIS was an action of *replevin* tried at the Rensselaer circuit, in September, 1835, before the Hon. JAMES VANDERPOEL, one of the circuit judges.

The declaration was for 41 bars of Russia iron. The defendants pleaded *non cepit,* and *property* in *Henry B. Titus,* in *Roswell Green,* and in *Furniss,* one of the defendants. The plaintiff claimed to recover on the ground that he had sold four tons of Russia iron, of which the 41 bars in question were a part, to *Henry B. Titus,* on credit, and that subsequently discovering him to have been insolvent at the time of the sale, he had repossessed himself of the iron under the right of stoppage *in transitu.* The defence set up was that *Furniss,* as a creditor of *Henry B. Titus,* obtained an *attachment* against him as an absconding debtor, issued by a justice of the peace, by virtue of which *Stickney,* the other defendant,

as a *constable*, levied upon the 41 bars of iron, and held the same under the attachment when the property was replevied by the plaintiff. The following facts appeared on the trial: The plaintiff was a merchant in *Troy*. Titus resided at a place called *Titusville*, about 8 miles distant from the village of *Malone*, in Franklin county. Titus sent an order to the plaintiff, dated *Malone*, 16*th August*, 1833, for 4 tons of old Sable P. S. I. iron, in which he acknowledged the receipt of advice from the plaintiff of the shipment of a quantity of steel. This order the plaintiff produced, and also a previous order of Titus, dated *Malone*, 5th August, 1833, in which he requested to have half a ton of steel of a particular mark sent to him, and directed it to be forwarded *to the care of Thomas Green of Plattsburgh*. On the 23d August the plaintiff weighed and marked 147 bars of Russia iron, and directed the iron to Titus at Malone, to the care of Thomas Green at Plattsburgh. It was a cash sale, the bill was sent to Titus per mail, and it was expected that the amount thereof would be remitted by the return mail. The iron was placed by the plaintiff in charge of a transportation company, who took it in a canal boat to Whitehall, and thence per the sloop *Napoleon* down Lake Champlain to Plattsburgh, where it was received in the warehouse of Thomas Green on the 28th August. On the 9th September, 41 bars of the iron were delivered by Green to one *Burton*, a common carrier by land, who was employed by Titus to convey the iron from Plattsburgh to *Titusville*. Whilst Burton was at Malone, about 8 miles from Titusville, on the 10th or 11th September, the iron was taken out of his possession by Stickney, on the attachment against Titus in favor of Furniss, and put into the barn of the latter—and about two or three weeks thereafter it was replevied. It was proved that Henry B. Titus conducted the business of scythe making at Titusville in connection with his nephew *William K. Titus*, and that they were in the habit, from time to time, of drawing upon one *John H. Titus* of New-York, for monies to carry on the business—the drafts sometimes being in the names of both, and at other times in the name of only one of them. On the 27th July a draft drawn by both for $500 was protested; on the 21st August

a draft drawn by Henry alone for $700 was protested ; and about the 1st September Henry confessed a judgment to secure the endorsers of several of the protested drafts. One witness testified that he considered both Henry and William to have failed and become insolvent as early as 27th July, 1833. One of the plaintiff's witnesses, on his cross-examination, testified that the plaintiff knew that Henry B. Titus had failed in business in New-York in 1829, and that on being asked how he came to trust Henry, he answered that he had sold him iron previously which had been promptly paid for ; and that he supposed Henry's friends in New-York were doing something for him and would pay for him. On this evidence the plaintiff rested. The counsel for the defendant moved for a nonsuit on the ground that the evidence did not show a right in the plaintiff to stop the iron *in transitu*, nor did it establish a case of fraud authorizing the plaintiff to retake the property. The judge directed a nonsuit. The plaintiff now asks for a new trial.

*J. N. Cushman*, for the plaintiff. A vendor has the right to resume the possession of goods sold by him on credit, while they are in the hands of a carrier or middle-man in their transit to the purchaser, on discovering that the purchaser at the time of the sale was insolvent. 3 *East*, 381. 1 *Esp. R.* 240. 2 *id.* 613. The iron in this case had not reached the actual possession of the purchaser, nor the place of its final destination, when the plaintiff repossessed himself of it. Here was not such a delivery as put an end to the right of stoppage *in transitu;* when the goods were taken by the plaintiff, they were in the hands of a common carrier. The defendants showed no right to the goods, there was not proper evidence of a seizure under an attachment, but had such a seizure been shown, it would not have deprived the plaintiff of his right of stoppage *in transitu*, his right being superior to that of a creditor of the purchaser. The plaintiff also would have had the right to re-possess himself of the property even had it come to the actual possession of the purchaser ; the goods having been fraudulently obtained by the purchaser when on the very brink of bankruptcy.

*P. Gansevoort*, for the defendants. The right of a vendor to repossess himself of property on the ground assumed by the plaintiff, exists only while the property is *in transitu*. 2 *Mason*, 236. If it has come to the actual possession of the purchaser, or is placed under circumstances equivalent to an actual possession by him, the vendor's right of stoppage is gone. So if the goods have arrived at an intermediate place, where they are subject to the orders of the purchaser, and are to remain stationary until a new direction is given by him to put them again in motion, for some new and ulterior destination, the *transitus* is at an end. 5 *East*, 175. 4 *Esp. N. P. R.* 82, 85, *note* 2. *Kent's Com.* 545. Such is the case here : the goods were directed to be forwarded to the care of a warehouseman at Plattsburgh. They were so forwarded. Plattsburgh was therefore the intermediate place, where the goods remained until a new direction was given them by the purchaser. They were at Plattsburgh entirely subject to his direction, and might have been ordered by him as well to any other place as to Malone. Besides, here was an unconditional delivery of the goods, and it is submitted whether even the delivery to the agent of the transportation company at Troy did not divest the plaintiff of his right of stoppage *in transitu ;* at all events, the delivery at Plattsburgh had that effect. If so, the property in the goods in question was in the purchaser, liable to seizure on the attachment ; and although from the state of the trial when the plaintiff was nonsuited, the existence of the attachment was not shown by legal proof, enough had appeared to show that the *plaintiff* was not entitled to recover. Again : the plaintiff was not entitled, under the circumstances of this case, to exercise the right of stoppage *in transitu*. He sold the goods to the purchaser with full knowledge of his circumstances ; he knew him to be insolvent in 1829, and even after the sale said he looked to his friends to assist him to pay this debt. Besides, a vendor should not be permitted to assert the right claimed by the plaintiff after so long a delay as took place in this case.

*S. Stevens*, in reply. The *transitus* was not ended when the plaintiff repossessed himself of the goods by virtue of the writ of replevin in this cause. The *destination* of the goods was the place of business of the purchaser at *Titusville*, and when the possession of them was resumed, they were still 8 miles distant from that place. Besides, they were in the hands of a middle-man, a common carrier, and the law is unquestioned, while they so remain, the right of stoppage *in transitu* may be exercised ; but though in the hands of an agent specially commissioned by the purchaser to transport them from Plattsburgh to the residence of the purchaser, still, before their arrival at their final destination, the plaintiff had a right to resume the possession. 6 *Barn. & Cres.* 422. 2 *Kent's Comm.* 544. The delivery of the goods at Troy or at Plattsburgh did not divest the right of stoppage *in transitu;* it constituted the purchaser the owner, but still the property was subject to the vendor's right of stoppage, which does not proceed upon the ground of rescinding the contract, but as a case of equitable lien. The time which elapsed after the sale before the plaintiff resumed the possession, does not affect the right exercised in this case as between the vendor and the purchaser, whatever might be its bearing as to *bona fide* purchasers for value. The defendant Furniss did not show himself a creditor of the purchaser ; but had he done so, he had no greater rights than his debtor—the equity of the vendor being greater than that of the creditor. At all events, the plaintiff is entitled to a new trial; instead of granting a nonsuit, the judge should have submitted to the jury the question whether the goods had not been fraudulently obtained by the purchaser, by ordering them when he knew his drafts had been protested, and that he must shortly become insolvent. So also the plaintiff's knowledge, at the time of the sale, of the insolvency of the purchaser, should have been submitted to the jury.

*By the Court*, BRONSON, J. The vendor, in the case of a sale on credit, may resume the possession of the goods while they are in the hands of a carrier or middle-man, in their transit to the consignee or vendee, on his becoming bankrupt or insolvent. In this case the goods had neither reached their

ALBANY,
Jan. 1836.

Buckley
v
Furniss.

destination, nor had they come to the actual possession of the vendee. They were in the hands of a carrier or middleman, on their way to the vendee, and the plaintiff had a right to stop them, unless there be something in this case to take it out of the operation of the general rule. It was urged, on the argument, that nearly forty days had elapsed between the sale and the stoppage of the goods. But I am not aware that it has ever been held, that the mere lapse of time was a circumstance of any importance, in determining the right of the vendor to resume possession of the goods, provided the right be exercised before the *transitus* is at an end. As between the vendor and vendee, no reason is perceived why this consideration should be permitted to affect the question. Mere delay on the part of the seller could neither deprive him of his right, nor confer a superior equity on the purchaser. But without attempting to decide what might be the effect of delay under circumstances that may possibly arise, it is sufficient, in this case, to say that there is no evidence going to establish the fact, that the plaintiff did not exercise the right of stopping the goods as soon as he could do so, after learning that the purchaser was insolvent. At what particular time he ascertained that fact does not appear, but I infer, from the evidence, that it must have been as late as the tenth or fifteenth day of September. The witness, James H. Titus, of New-York, testified that he was at the works, (in Malone) and left there on the sixth of September; that he saw the plaintiff in New-York, before he replevied the iron, and told him Henry had no interest there, (at Malone,) and advised him to go and get the iron back. If this conversation was after the witness returned to New-York, there was no great delay on the part of the plaintiff in resuming possession of the property after he learned that the purchaser was a bankrupt.

Another ground taken by the defendant's counsel is, that the plaintiff sold the goods with a full knowledge of the situation of Titus, and that the sale was consequently absolute. The sale was no doubt absolute, whether the plaintiff knew that Titus was insolvent or not; and so are most sales, where the vendor afterwards exercises the right of stoppage *in transitu.* The right of the vendor to resume the possession of

goods sold on credit, in case of the insolvency of the consignee, before they come to his hands, does not depend upon any condition, or other peculiarity in the contract of sale, but proceeds on the ground of an equitable lien. Still, it may be, and probably is true, that if the plaintiff sold the iron, with a full knowledge of the situation of the vendee, he could not afterwards exercise the right of stoppage *in transitu*; but the argument is not borne out by the facts of the case. The plaintiff knew Titus when he failed in New-York in 1829, but it does not appear that he knew that he had ever since remained insolvent. On the contrary, he found him subsequently engaged in business at Malone, and representing that he was largely interested in real estate. The plaintiff had before sold goods to Titus, and been promptly paid; and there was no evidence that at the time of the sale of the iron in question, he knew that Titus was largely indebted, on account of his business at Malone, or that his notes and drafts had been protested in New-York, Troy, and other places, as was the fact. The truth, no doubt, is, that the plaintiff was deceived by the false representations of Titus, and the credit was fraudulently obtained. There is, then, nothing in this branch of the argument which militates against the right of the plaintiff to retake the goods.

If the defendants intended to rely on the attachment, they should have given it in evidence on the trial. *Jenner* v. *Joliffe*, 6 *Johns. R.* 9. But if the attachment had been duly proved, it would not have constituted a good defence. The defendant Furniss, as an attaching creditor, could have no better right to the goods than Titus had himself. He might, by legal process, acquire a priority over other creditors, who were less diligent, and thus secure his debt; but he could not divest a right already existing in the plaintiff. The process does not proceed on the ground of defeating a prior right in a third person, but on the ground of acquiring such interest in the property attached as the debtor had himself. If the levy of an execution, or the service of an attachment against the vendee, were allowed to defeat the claim of the vendor, the right of stoppage *in transitu* would be of little value; for in this state, judgments and attachments not unfrequently furnish the first public evidence of the insolvency of a trader. In *Oppenheim* v.

*Russell*, 3 *Bos. & Pul.* 42, the *carrier* attempted to set up a lien for a general balance of account against the consignee, to defeat the right of the consignors to stop the goods ; but the defence was overruled.   Lord Alvanley, Ch. J., in delivering the opinion of the court, says, " it was admitted that if the consignee had made an assignment of the goods, his assignee could not have defeated the rights of the con-ignor." And he adds, that the consignor can resume possession of the goods " without satisfying any rights derived under the consignee, if he claim to resume them before they come into that situation which gives the consignee a complete dominion over them."   Chambre, J., notices an argument which had been urged by the defendants' counsel, that a creditor of the consignee might have taken the goods in execution on their passage, but he gives no opinion on the point.   That precise question was decided in favor of the consignor soon afterwards, in the case of *Smith and another* v. *Goss*, 1 *Campb. N. P. Rep.* 282.   The goods, while on their passage, had been attached by process out of the mayor's court of London, at the suit of a creditor of the vendee.   Lord Ellenborough held, that " the vendor's power of intercepting the goods was the elder and preferable lien, and was not superseded by the attachment." This seems to have been regarded as the settled law on this question ever since. 2 *Kent's Comm.* 541, 2, 547, 550.   The point was decided by this court at January term, 1833, in the case of *Le Ray De Chaumont* v. *Griffin*, which has not been reported.   In that case the plaintiff owned a furnace at Carthage, in the county of Jefferson, where he manufactured pig and scrap iron.   He sold a quantity of iron to Walbridge & Co. who were merchants at Syracuse, on credit, to be forwarded by the way of Sacket's Harbor and Oswego to the purchasers at Syracuse.   After the iron reached Sacket's Harbor, and while it remained in the hands of one Butterfield, a forwarding merchant at that place, an execution against the vendees at the suit of certain creditors, was levied upon the property. After the levy, the plaintiff, learning that the vendees had become insolvent, directed Butterfield to retain the property. The sheriff, disregarding the plaintiff's claim, proceeded on the execution, and sold the iron to the defendant, who purchased

for the judgment creditors. The plaintiffs' agent attended, and forbade the sale. The defendant, after the sale, took the iron and carried it away, and the plaintiff brought an action to recover the value. The judge charged the jury, that the levy of the execution did not destroy the plaintiffs' right to stop the goods, and the jury found a verdict for the plaintiff, for $952,21, the value of the iron. After argument, this court held that the defendant, and the judgment creditors whom he represented, had no better right to the iron than the purchasers had themselves, and that the plaintiff clearly had the right to stop the goods, notwithstanding the levy ; and judgment was rendered in his favor on the verdict. If there had been a sale on the execution, and a bona fide purchaser had parted with his money before the vendor asserted his right ; or if the vendor had done any act which might have misled third persons, that would have given rise to a different question. *Hunn* v. *Bowne*, 2 *Caines*, 38. *Davis* v. *Reynolds*, 4 *Campb. N. P. R.* 267. *Buffington* v. *Gerrish*, 15 *Mass. Rep.* 156.

Another point made on the part of the defendants is, that there was an unconditional delivery of the goods, and that the vendor could not afterwards exercise the right of stopping them *in transitu.* It may be conceded that the title to the goods passed to the vendee, when they were forwarded pursuant to his order ; that the delivery to the carrier was for most purposes a delivery to the purchaser, and the loss of the property if it had been sunk or destroyed, would have fallen on him. Still it was only a constructive, not an actual delivery to the vendee ; and such interest as he had in them was subject to be defeated, in case of his insolvency, by the exercise of the vendor's right to stop the goods before they came to the actual possession of the purchaser. *Ellis* v. *Hunt*, 3 *Durn. & East*, 468, *per Buller*, *J. Stokes* v. *LaRiviere, and Hunter* v. *Beal*, *before Lord Mansfield*, *cited* 3 *Durn. & East*, 466. There are cases where the delivery of the goods to a third person for safe custody, for disposal on the part of the vendee, or to await his orders as to the place of destination, has been held equivalent to an actual delivery to the vendee, and that the vendor's right

to stop the goods was consequently determined. But where the delivery to a carrier or other agent is for the mere purpose of conveyance to the purchaser, the right of the vendor to stop the goods continues until they come to the actual possession of the vendee, or reach the end of their journey. It is believed that no case to the contrary can be found. Indeed a different doctrine would completely overturn the right of the vendor to stop the goods in almost every case that can be supposed.

But the ground on which the defendant's counsel seemed principally to rely, was, that the *transitus* of the goods was at an end when they reached Green's warehouse at Plattsburgh. The order for the iron did not specify the mode in which it was to be forwarded, but it seems to have been understood that the plaintiff was to follow the directions contained in the previous order for a quantity of steel. The iron was accordingly marked, and directed to Titus at Malone, to the care of Thomas Green, Plattsburgh, and delivered to the carrier. The mode of transportation was, from Troy to Whitehall by the canal, from thence to Plattsburgh by vessels on Lake Champlain, and from that place to the residence of the plaintiff the transportation was over land. Plattsburgh was only one of the stages, not the *terminus* of the journey ; and Green was as much a middle man between the vendor and the vendee as was the master of the canal boat at Troy, or the captain of the sloop Napoleon on lake Champlain. The warehouse-man was not the agent of Titus for any other purpose than that of storing the goods, and the goods only rested at that place for the purpose of changing the mode of transportation. They were not to remain at Plattsburgh until the vendee should put them in motion in a new direction ; their *ultimate destination* had already been fixed by the vendee, and that destination they had not reached. The *transitus* was therefore not at an end, and in such a case the vendor clearly had the right to resume possession of the goods. *Coates* v. *Railton*, 6 *Barn.& Cress.* 422. *Hodgson* v. *Loy*, 7 *T. R.* 435. The cases cited for the defendants are plainly distinguishable from the one before the court. *Dixon* v. *Baldwin*, 5 *East*, 186, was decided on the ground that " the goods had so far gotten to the end of their journey, that they waited for

new orders from the purchaser to put them again in motion, to communicate to them another substantive destination, and that without such orders they would continue stationary. In *Rowe* v. *Pickford*, 8 *Taunton*, 83, the goods had reached their final place of delivery. In *Leeds* v. *Wright*, 3 *Bos. & Pul.* 320, the agent who ordered the goods had a general authority to send them to his principals in Paris, or to Holland, Germany, or such other market as he might deem most beneficial. The goods having been delivered to a packer in London, pursuant to the direction of the agent, it was held that the *transitus* was at an end. In *Coates* v. *Railton*, already cited, Bayley, J. reviews several of the cases, and concludes by saying, " the principle to be deduced from these cases is, that the *transitus* is not at an end until the goods have reached the place named by the buyer to the seller, as the place of their destination." As a general rule, this remark is no doubt well founded. In the case under consideration, the place of destination named by Titus, the purchaser, was not Plattsburgh but Malone ; and Green sustained no other character than that of middle-man between the parties.

The nonsuit must be set aside, and a new trial granted ; costs to abide the event of the suit.