## Harris and another v. Pratt and another.

A vendor's right of stoppage in transitu is not terminated by the goods coming to the hands of a shipping agent appointed by the vendee, though they are delivered to him to await further directions in respect to the time and mode of shipment to the vendee at an ultimate destination previously fixed and not to be affected by such subsequent directions. The transit continues until the goods come to the possession of the vendee or of some agent authorized to act in respect to the disposition of them otherwise than by forwarding them to the vendee.

The assignee in trust for creditors of the insolvent vendee is not a purchaser for value, and takes subject to the exercise of any right of stoppage in transitu which may exist against his assignor.

Two partners carried on business at New-York, and at Nottingham in England, under different firms, one partner residing at each of those places. They bought goods of the plaintiffs in the name of the English firm, informing them that such goods were purchased for the New-York house, and directing them to be sent to E. S. & Co. of Liverpool, to await further instructions in respect to shipment. They were sent accordingly to E. S. & Co., and by them, in accordance with the directions of the English firm given shortly afterwards, shipped to the New-York firm. Before their arrival at New-York the vendees became insolvent and made an assignment of all their assets to the defendants in trust for the payment of the debts of the firm. The plaintiffs,

while the goods were yet on shipboard, and on the same day such assignment was made, asserted their right of stoppage in transitu, and notified the defendants thereof, who, before receiving such notice, had made an entry of the goods at the custom house; *Held*, that the transit had not ended, and the plaintiffs had the right to stop the goods.

APPEAL from the Superior Court of the city of New-York. Action for the recovery of personal property, tried before WOODRUFF, J., in May, 1856.

The plaintiffs were manufacturers, at Leicester, England. John and James Hall were copartners and merchants in the city of New-York, where they dealt in lace and hosiery, under the name of Hall Brothers. They had also a house in Nottingham, England, where they carried on business under the name of J. & J. Hall. John Hall resided at Nottingham, and James in New-York. The business of the house in England consisted almost entirely in transactions with the New-York house. For several years prior to the transaction in question there was a course of dealing between the plaintiffs and the Halls, which consisted in the sale by the plaintiffs to them of manufactured articles in the plaintiffs' line, which were sent to Messrs. Edwards, Sanford & Co., shipping agents at Liverpool, from whence they were shipped to New-York and Boston, to be disposed of by Hall Brothers of New-York. In some instances, where the quantity of goods sold by the plaintiffs at the time were too small to make a case, they were sent to the house in Nottingham. The goods thus sold by the plaintiffs were paid for by bills drawn by them upon J. & J. Hall of Nottingham, at four months. John Pratt, one of the defendants, was in the employment of the Halls, and generally resided in New-York, whence he made periodical voyages to England as their purchasing agent. In October, 1853, he called upon the plaintiffs, at Leicester, and ordered the goods in question in this action, being about two thousand pairs of cotton gloves, to be manufactured for the New-York market, stating that they were destined for New-York, and directing the

plaintiffs to pack them in the usual way and send them to Edwards, Sanford & Co., Liverpool, but informing them that the goods were wanted for the fall trade of 1854, and that they were not to be forwarded for shipment until about the 1st of May, 1854.

In February, 1854, the plaintiffs informed J. & J. Hall, Nottingham, by letter, that the gloves were ready, and asked for the marks and numbers to be put upon the cases; to which the latter answered that it was a fall order which had been given, and that the goods would not be wanted for shipment before May, and that the marks and numbers would be sent in season. On the 25th of April, 1854, the plaintiffs, having received the marks and numbers required, wrote to J. & J. Hall, inclosing the invoice of the gloves, which had been packed in eight cases and marked as directed, saying they had sent them to Edwards, Sanford & Co., Liverpool, " to await your further orders for shipment." The invoice was to J. & J. Hall, Nottingham; the amount of the goods being £707 11*s* 7*d*. It contained this memorandum : " Conveyance Pickard & Co., to Messrs. Edwards, Sanford & Co., Liverpool." At the same date, the plaintiffs wrote to these shipping agents that they had sent them the eight cases, mentioning the marks, for J. & J. Hall, Nottingham, from whom, they added, " you will receive further instructions." J. & J. Hall, by letter from Nottingham, thereupon instructed Edwards, Sanford & Co. to ship these cases to their New-York house by the sailing packet of May 1, or, if too late for that, by a subsequent packet. The agents shipped them by the ship Hussar on the ninth of May, taking a bill of lading by which Hall Brothers, New-York, were mentioned as consignees. They advised the Nottingham house of the shipment, on the tenth of May, and the plaintiffs on the thirteenth of the same month, stating in the last mentioned letter that the expenses were charged to J. & J. Hall. The Hussar arrived in New-York, 10th of June, 1854, before which time James Hall had died at New-

York, and the Halls had stopped payment and become insolvent. On the fourteenth of June, an agent of the plaintiffs in New-York made a demand of the goods of the owners of the ship and of the custom house officers on board, and also of the defendants, to whom John Hall, the surviving partner of Hall Brothers, had, on the same day, assigned the property of the firm for the benefit of its creditors. The defendants, on the same day, after the execution of the assignment and before the demand by the plaintiffs' agent of them, made an entry of the goods at the custom house. It did not appear whether such entry was made before or after the demand on behalf of the plaintiffs was made of the ship owners and custom house officers. The goods were not given up to the plaintiffs, but the defendants subsequently, and after the commencement of the action, paid the freight and the duties and took possession of the goods.

The judge directed a verdict for the plaintiffs for the value of the goods, and the defendants' counsel excepted. The case was heard at a general term, where the plaintiffs had judgment. The defendants appealed.

*Albert Matthews*, for the appellants.

*Henry Nicoll*, for the respondents.

DENIO, J. ⟩ The general rule in this class of cases is that while the goods remain in the possession of persons concerned in their transportation to the place of destination named by the purchaser, they may in the event of his failure be reclaimed by the seller. ⟨ It is not material whether the person in whose possession they are when the seller interposes his claim be a carrier, a warehouse keeper, a wharfinger, packer or other depositary, or an agent for the purpose of forwarding, nor by which of the parties to the sale he was employed. He may be the agent of the purchaser, designated, paid and employed by him, yet if the

Harris *v.* Pratt.

purpose of his employment is to expedite the property towards its destination, or to aid those engaged in forwarding it, the seller's right to stay the final delivery continues. But, however clearly the general principle may be stated, the circumstances of commercial dealings are so various that cases are apt to arise in which its application is a matter of extreme difficulty. [ When the seller attempts to claim the goods the question is whether they have arrived at the end of their transit, and this usually depends upon the further question whether the party in whose hands they are found is acting in the character of an agent for transportation, or as the agent of the purchaser, holding them simply for his use unconnected with the business of forwarding them. ] It sometimes happens that the seller delivers goods sold on credit immediately to an agent of the purchaser, or that, as in the present case, he sends them a part of the way to their final destination, and they are delivered to such agent of the buyer. When they have been so delivered according to the vendee's direction, either immediately upon the sale or after being carried a part of the distance, the question arises whether the seller retains a right to stop them on account of the failure of the purchaser. Under certain circumstances the depositary in these cases is considered as the general agent of the purchaser, and the goods when in his hands are adjudged to be virtually in the possession of such purchaser and not *in transitu;* while under a state of facts somewhat different the person into whose custody they thus came is regarded as an agent for expediting them, and the right of stoppage continues until they come to the purchaser's hands at his place of business, or at some other place where he has directed them to be sent. The question is within which of these classes the present case falls. To resolve it we must look carefully into the several cases which have been determined upon that distinction.

In *Dixon* v. *Baldwen* (5 *East,* 185), the goods were sold on credit by a cotton spinner at Manchester to Battier &

Son, merchants of London, but they were directed to be sent to Metcalf & Co., of Hull, for the purpose of being shipped to the correspondents of the Battiers at Hamburgh, and by these correspondents sent to the persons for whom the goods were intended. They were reclaimed by the sellers while in the hands of Metcalf & Co., awaiting orders from Battier & Son, who had failed. Lord ELLENBOROUGH, C. J., and a majority of the Court of King's Bench (GROSE, J., alone expressing a different opinion), held that the *transitus* was at an end. The chief justice remarked that " the goods had so far gotten to the end of their journey that they waited for new orders from the purchaser to put them again in motion, to communicate to them another substantive destination, and that without such order they would continue stationary." If the final destination of the goods had been Hamburgh the case would have closely resembled the one before us. But it is to be remembered that they were to be shipped to Hamburgh for distribution, by the correspondents of the Battiers at that port, to other parties not named, and who and their residence were doubtless unknown to the seller. It is plainly inferable that these London merchants were engaged in selling and forwarding goods purchased by them in England to various ports in northern Europe through the port of Hamburgh. It did not enter into the dealings between the sellers and the purchasers in England that the former should be made acquainted with the names and residences of the buyers' customers on the continent. Their information was simply that the Battiers purchased for exportation to the continent through Hamburgh. To enable them to carry on that trade the sellers were to send the goods to Hull. Hence Lord ELLENBOROUGH says that they waited at Hull for the sellers to communicate to them another substantive destination. It was not the same destination which had been mentioned to the sellers, but other commercial adventures which it did

not enter into the views of the parties to the sale to confer upon; the manufacturers having no concern with them.

In *Leeds* v. *Wright* (3 *Bos. & Pul.*, 320), the goods were purchased of the plaintiff at Manchester by one Moisseron, in the name of Le Grand & Co., of Paris, for whom he was general agent in London. The seller, by Moisseron's directions, sent them to the house of the defendant, a packer in London, where some of them were unpacked and sent away and the remainder repacked. Moisseron had authority to send the goods to Paris, Holland or Germany, or any other market as he should think most beneficial. While the balance of the goods were at the packer's Le Grand & Co. failed, upon which the plaintiff demanded the goods. It was held that the *transitus* had ended. Lord ALVANLEY said : " These goods were not sent to the defendant, the packer, to be delivered by him to the house of Le Grand & Co., at Paris, but they were sent to Moisseron, the agent of that house in London, and were there to await his disposal, he being invested with authority to send them to such market as he should think most advisable. Indeed, Moisseron might if he had so pleased have made London the place of their ultimate destination, and have disposed of the goods there." The further voyage here was entirely contingent, and cannot be said to have at all entered into the contemplation of the parties to the sale. If the *transitus* did not end in London it is difficult to say that it would have terminated until the property had reached the parties to whom it should be ultimately consigned by the first purchaser or his agent, wherever they might reside.

*Valpy* v. *Gibson* (4 *Mann., Gra. & Scott*, 837), is another case strikingly like the one before us in some of its circumstances, but yet I think distinguished from it in a material particular. The sellers were Gibson & Co., who had places of business at Leeds and at Manchester. The purchaser was Edward Brown, a general merchant at Birmingham, who made the purchase to fill an order he had received for goods

to be shipped to Valparaiso. The sellers forwarded the goods, by the purchaser's directions, to certain shipping agents at Liverpool. They were put on board a vessel bound for Brazil, but were relanded by the purchaser's authority and sent to the sellers' house at Manchester to be repacked in different parcels. Before the packing was completed Brown failed, and the sellers claimed the goods under the law of stoppage *in transitu;* but it was held that they had not that right. If Brown had been a dealer living at Valparaiso, and had purchased the goods to be sent to himself there, though the sellers were to deliver them to the shipping agents, and the latter to receive their directions as to the shipment from other parties than the sellers, a different character would, I think, have been attributed to the voyage from Liverpool to Valparaiso. In the actual circumstances that might well have been considered a fresh commercial adventure, having no connection with the previous sale. The purchaser residing in the immediate vicinity of Liverpool may very properly be regarded as saying to the sellers, send the goods to my agents at Liverpool, and that, so far as we are concerned, will be a delivery to me. Brown it is true, transmitted to the sellers the order he had received to purchase goods to be sent to Valparaiso, but this was rather with a view of obtaining the kind of goods ordered, than because their destination was otherwise material to the sellers.

In *Rowe* v. *Pickford* (8 *Taunt.*, 83), the facts were that Lange, a bankrupt, whose assignees the plaintiffs were, was in the habit of purchasing Manchester goods and exporting them to the continent on or shortly after their arrival in London. The goods in question were purchased of one Chaffe, a Manchester manufacturer, who addressed them to the bankrupt in London and delivered them to the defendants, who were carriers between Manchester and London and had warehouses at each of those cities, and who transported them to London; and while they were in their store-

house there Lange committed an act of bankruptcy. Chaffe stopped their delivery to the bankrupt, and the assignees thereafter brought this action against the carriers. It was shown that the bankrupt had no warehouse of his own, but his goods arriving at the defendants' warehouse were suffered to remain there until he had an opportunity of shipping them, when he gave the shipping agents orders for them, who on taking them paid the charges of the carriers. The bankrupt's clerk had seen these goods after their arrival, and had directed the carriers not to let them go without an order. The court held that the goods had reached their final destination and that the *transitus* was at an end. The plaintiffs accordingly had judgment.

These are the most prominent of the cases relied on by the defendant's counsel. There are several others in which it was held that the transit had terminated though the goods had not actually reached the purchaser's hands at the place of their destination. ( *Scott* v. *Pettit*, 3 *Bos. & Pul.*, 469 ; *Ellis* v. *Hunt*, 3 *Term R.*, 464 ; *Dodson* v. *Wentworth*, 4 *Mann. & Gr.*, 1080 ; *Wentworth* v. *Outhwaitoe*, 10 *Mees. & Wels.*, 436.) It had been said by judges in some of the earlier cases that the right of stoppage continued until the goods had reached the corporal touch of the consignee. But it was afterwards said that this expression was figurative. The cases last cited are illustrations of the doctrine that if the person into whose hands the goods come does not receive them as a carrier or for the purpose of expediting their further transportation but simply as the agent of the pur- chaser for his use for general purposes unconnected with transportation, it is virtually the possession of the purchaser himself.

I have now to notice some cases of the other class, in which it has been held that the right of stoppage continued until the goods had reached their final destination, though before that they had been delivered to an agent of the pur- chasers.

*Stokes* v. *La Riviere* is reported by LAWRENCE, J., in his opinion in *Bohtlingk* v. *Inglis* (3 *East*, 381). The goods were purchased in London, personally, by a French merchant residing at Lislé, but who was temporarily in London, and were delivered to the defendants, who do not appear to have been forwarders, to be sent to the purchaser at Lisle. The defendants sent them to their correspondent at Ostend, who informed the purchaser that they waited his directions. The purchaser failed, and the goods got back into the hands of the defendants, and at this point the seller reclaimed them and the question arose. The defendants claimed that on the delivery to them the property became the purchaser's. Lord MANSFIELD, before whom the case was tried, held that the vendor had a right to the goods. He said that the seller could stop them "in every sort of passage to the hands of the buyers." This is a strong case in favor of the right of the vendor. The purchaser's own agents, who were not themselves carriers, took upon them the care of expediting the goods; yet, as they were actually in a course of transportation to the owner, though under arrangements which he had made, it was considered that the right to stop them existed.

In *Coates* v. *Railton* (6 *Barn. & Cress.*, 422), the sellers, the plaintiffs in the action, were manufacturers at Manchester. There was a house in London trading under the name of Butler Brothers. The members of this firm had also a house in Lisbon, under the firm of Butlers, Krus & Co.; Krus not being a member of the London house, but the other partners of the two houses being the same. The defendants were commission agents resident at Manchester. The course of dealing was for the Lisbon house to send their orders to the defendants through the London house, and the defendants made the purchases in the name of the London house, and forwarded the goods to Lisbon by the way of Liverpool; and the sellers thereupon drew for the price upon the London house, at three months. The goods in

question were purchased by the defendants of the plaintiffs, pursuant to this course of dealing, in the name of the London house, the defendants informing the plaintiffs that they were to be sent to Lisbon as on former occasions. They were delivered to the defendants, who were to forward them to Liverpool; but, while they were in the defendants' warehouse, both the firms in London and Lisbon failed. The plaintiffs then demanded the goods, but the defendants refused to give them up. Lord TENTERDEN, C. J., before whom the case was tried, was of opinion that as Lisbon was the ultimate destination of the goods, they continued to be in transitu while they were in the warehouse of the defendants, and that the plaintiffs therefore had a right to stop them. On a motion to set aside the verdict, Lord TENTERDEN said that the goods were in fact purchased for the Lisbon house, though in the name of the London firm. He laid stress upon the fact that the defendants were packers and warehousemen as well as general agents. If they had been merely warehousemen, he said, the right of stoppage, at any time before the goods reached Lisbon, would have been clear, and he thought that the fact that they were general agents did not make any difference.

BAYLEY, J., examined *Dixon* v. *Baldwin*, *Leeds* v. *Wright*, and *Rowe* v. *Pickford*, and said that the principle to be deduced from these cases was that the transitus was not at an end until the goods had reached the place named by the buyer to the seller as the place of their destination. Here, he said, the place so named was Lisbon.

The case under review is, I think, stronger in favor of the right of stoppage than the one referred to. Edwards, Sanford & Co., were agents to facilitate the transportation, and they had no other character. The defendants in the case referred to were, as warehousemen, connected with transportation, but they were also the agents for purchasing, and it was equivocal whether they received the goods in one or the other of these characters. In the case under examination

the purchase was made in the name of the Nottingham house, and in the one cited it was in the name of the London house; the payments were to be made by bills on these houses respectively; but the goods were bought in both cases for shipment to known parties at a given foreign port which was their ultimate destination, and that destination was mentioned to the sellers. As to the consideration that the goods in the present case were for a few days stationary in the hands of the shipping agents at Liverpool, awaiting orders for shipment from the Halls of Nottingham, this was not on account of any uncertainty as to their eventual destination, but was simply a delay arising out of the nature of the business which left to the Nottingham house the selection of the vessel by which they were to be sent. The agents of the purchasers in *Coates* v. *Railston* had at least equal authority to direct the time and manner of the transportation which J. & J. Hall had in the case under examination; and I am of opinion that in the English courts the determination of the present case would be governed by the judgment in the one referred to. The great authority of Lord Tenterden upon questions of commercial law gives additional weight to the precedent, as does the fact that the case was decided subsequently to those upon which the defendants place their greatest reliance and that the latter were examined and distinguished. *Coates* v. *Railston* was followed in *Nicholls* v. *Le Feuvre* ( 2 *Bing.*, N. C., 81,) where goods destined for the Island of Guernsey were sent by the vendor to a shipping agent at Southampton and were reclaimed after delivery at that port, the court sustaining the vendor's claim; and in *Jackson* v. *Nichol*, ( 5 *id.*, 508 ). In that case goods were purchased by a London merchant at Newcastle-upon-Tyne. The seller gave the purchasing agent of the vendee, at Newcastle, an order upon the person having charge of the goods, and the agent, by means of the order, himself caused the goods to be put on board ship and consigned to the purchaser in London. Lord DENMAN, C. J., said that the order

was only a link in the chain of machinery by which the property was put in motion and in the course of transmission from the seller's premises in Newcastle to the buyer's in London. In *Aguirre* v. *Parmelee* (22 *Conn.*, 473) the Supreme Court of Connecticut applied the principle of these cases to one were the circumstances where much more unfavorable to the vendor than those of the case before us. Cotton was bought of the plaintiff in New-York, through a broker employed by the purchasing agent of a manufacturing company, the place of business of which was at Enfield in Connecticut, and the plaintiffs, the sellers, were given to understand that it was wanted for consumption there. The plaintiffs gave the servant of the broker an order on the public store of the custom house, where the cotton was stored, and by means of this order the agent sent the cotton off by rail-road consigned to a different manufactory than the one by which it was purchased. The vendees failed and the plaintiffs stopped the cotton in the cars. For the defendant it was insisted that the giving of the order, the cotton being obtained under it, was a full and complete delivery to the purchasers. But the court regarded the purchasing agent as acting also in the business of expediting the goods, and they held the stoppage to be warranted.

The cases upon this doctrine in our own courts are in consonance with the foregoing authorities, though they do not present any striking illustration of the particular distinction involved in this case. (*Buckley* v. *Furniss*, 15 *Wend.*, 137; *Hitchcock* v. *Covell*, 20 *id.*, 167; *S. C.*, *in error*, 23 *id.*, 611.) The Supreme Court of Pennsylvania hold that where goods are imported from a foreign country in the vendee's own vessel, there is no right of stoppage in transitu; the delivery to the master being considered as virtually a delivery to the vendee, though the master, in form, sign a bill of lading. This judgment depends upon special circumstances, and does not conflict with the opinion we have

arrived at in this case, and it is unnecessary to say whether we should approve it or not.

In applying the principle of these last adjudications to the particular facts in this case we cannot consider the sending of the goods by the plaintiffs to the shipping agents at Liverpool as a full and final delivery of them to the purchasers. We regard what was done by the Halls of Nottingham, in giving directions to the shipping agents, to have been in aid of the general purpose of sending the goods to New-York. The partner at Nottingham, though in law one of the purchasers, acted in regard to these goods as an agent of the house at New-York in facilitating the transportation to that city. During the short time the goods remained in the hands of these agents, before the directions came from Nottingham, they could not be said to be "awaiting new orders from the purchaser to put them again in motion, to communicate to them another substantive destination" in the sense in which that language was used by Lord ELLEN-BOROUGH, in *Dixon* v. *Baldwen*. New-York was the destination contemplated from the beginning. It was the one named to the vendor, and there was no thought of diverting the goods from that point, at any time or by any person. They were awaiting a new impulse only in the sense in which that may be predicated of freight in transitu which is temporarily at rest while arrangements are making to send it forward on the journey on which it was originally embarked.

We are of opinion, therefore, that the transitus was not determined at Liverpool.

When the plaintiffs exerted their right of stoppage at New-York, the property was in the hands of the carriers on board their vessel, and subject to their lien for freight. All that had been done by the defendants before such reclamation (if indeed they had done anything whatever), was to make an entry at the Custom-house. There is no authority for holding that formality to be equivalent to the delivery

of possession, and it is not in its nature the act of taking possession. In *Mottram* v. *Heyer* (1 *Denio*, 483; *S. C.*, 5 *id.*, 629), the freight had been paid and the goods landed and placed in the public store, the duties being unpaid, yet the chancellor, in giving the prevailing opinion in the Court of Errors, held that the goods were still in transitu.

I think the judgment should be affirmed.

STRONG, J. The right of stoppage in transitu on a sale of goods on credit, arises where the vendee becomes insolvent after the sale and before the goods have been actually delivered to him, or to his agent for him, having some authority in respect to the goods unconnected with their transit, as to keep or dispose of them. The basis of this right is that the insolvency of the vendee was not contemplated by the vendor in the sale, and that it is plainly just that he should, on account of that unforeseen event, endangering the loss of the price to be paid, be permitted to reclaim the goods and keep them as security for payment at any time before a delivery terminating their transit. The right is limited to that period, and ends with such a delivery. It is a right which, from its equitable nature, is regarded with favor, and the rules relating to it are applied, with great liberality to the vendor, in furtherance of justice. These rules are well settled and familiar, but in the application of them, particularly that in regard to the determination of the right by a delivery of the goods, there is often great difficulty. The difficulty is in deciding whether the facts and circumstances in particular instances amount to a delivery terminating the transit, and this has led to some apparent if not real conflict between adjudged cases.

Chancellor KENT, in his Commentaries (*vol.* 2, *p.* 545) in treating of this subject, observes that " the cases in general, upon the subject of constructive delivery, may be reconciled by the distinction that if the delivery to a carrier or agent of the vendee be for the purpose of conveyance to the

vendee, the right of stoppage continues notwithstanding such a constructive delivery to the vendee; but if the goods be delivered to the carrier or agent for safe custody or for disposal on the part of the vendee, and the middleman is by agreement converted into a special agent for the buyer, the transit or passage of the goods terminates, and with it the right of stoppage." This observation will be found to be fully justified on a careful examination of the cases, as well those in England as in this country. The distinction is fully established and appears to be entirely sound in principle.

A delivery to a carrier, for the purpose of carriage, obviously does not affect the right of stoppage in transitu; as it is a right given by law to the vendor during the transit. For the same reason, a delivery to any other agent, in the course of the transit, merely to perform some act in reference to forwarding the goods, will not affect the right. The right continues until the goods come to the actual possession of the vendee, or of his agent to receive them and terminate the transit. (*Buckley* v. *Furniss*, 15 *Wend.*, 137; 17 *id.*, 504; *Covell* v. *Hitchcock*, 23 *id.*, 611; *Mottram* v. *Heyer*, 5 *Hill*, 629.)

A vendee purchasing goods abroad may receive them into his actual possession at the place of purchase and the right of stoppage will not thereafter exist; so he may take actual possession of them at some point intermediate the place of purchase and the place where he designs to use or dispose of them, or employ an agent to do so, and thereby terminate the transit and with it the right of stoppage; but when he does not do so, and the goods are to be carried to the vendee or to an appointed destination, the transit and the right of stoppage continue until the actual delivery of the goods to the vendee, or to the proper person at the place appointed.

The principal point made by the defendants' counsel is that upon the delivery of the goods to Edwards, Sanford & Co., the transit thereof and consequently the right of stoppage were at an end. The counsel, in presenting his

views in support of this point, treats the firm of J. & J. Hall as the purchasers of the goods of the vendors, and the sellers of the same subsequently to Hall Brothers, and in that aspect of the case argues that, as between the original vendors and their vendees, Edwards, Sandford & Co's at Liverpool, was the destination of the goods and their transit ended at that place ; and that when the goods were shipped at that point for New-York, a new transit commenced. I am satisfied that neither this assumption nor the argument is supported by the facts. The members of these firms were identical, and they were the owners of all the property of both firms ; they might for their convenience transact business at different places under different names, making such division as they pleased of their effects in reference to their firm names, and transfer property nominally belonging to one firm to the other from time to time, but they could not sell, in a legal sense, to themselves what they already owned. Transacting business in that mode, undoubtedly on a purchase of goods abroad in either firm name, without any special circumstances as to the destination of them, the proper destination would be their place of business under that name ; but if it clearly appeared that goods purchased in the name used for one branch of the business were in fact purchased for, and to be sent directly from the vendors to, the other branch, the place where the latter carried on business would be their legal destination. In such a case as last named, the mode of making out the bill for the goods, as to the name used for the vendees, and of entering the transaction in the books of the firms, and whether the acceptances for the price were to be in one or the other firm name, would be no part of the substance of the transaction, but merely formal and referrible wholly to motives of convenience. Those facts might be material on the question of the destination of the goods ; but the actual destination, in their transit from the vendor, would be the substantial matter of inquiry, and when ascertained would

govern as to the limit of the transit and the right of stoppage. It is plain beyond dispute that the goods in question were purchased to be sent to Hall Brothers, New-York. That manifestly was their destination unless the direction to the vendors to forward them to Liverpool to Edwards, Sandford & Co., in connection with other circumstances, established a different destination. In order for that direction, supported by other circumstances, to work such an effect, they must have constituted Edwards, Sandford & Co. special agents of the vendees to receive and hold the goods for the latter, beyond the agency which would arise from sending the goods to them to be forwarded on their route, in the ordinary course of their business. If the goods were sent to them as mere shipping agents, which was their ordinary business, to ship them to Hall Brothers, no such consequence was produced. Looking at the previous long continued course of extensive dealings between the parties, with which the present one was in perfect accordance, it is clear to my mind that the employment of Edwards, Sandford & Co. was as mere forwarding agents, in their usual course of business. The goods purchased of the vendors for Hall Brothers were uniformly sent to those agents, and by them shipped for New-York. There is nothing in the case which will warrant the idea of any special agency. I do not think any weight is due on this subject to the fact that the goods were sent to them with advice that they would receive from J. & J. Hall further instructions in regard to the goods. It is apparent from the evidence that the instructions referred to were those subsequently given, as to the time of shipment and the vessel to be employed. That the goods were to be sent to New-York was determined when the purchase was made, and for that purpose the direction was given that they should be forwarded to Edwards, Sandford & Co. No change of that determination was made or so far as appears intended or thought of. It appears that the vendors were to pay the expenses of sending the goods to Liverpool, from

which place the vendees were to provide for their carriage; and hence the propriety of instructions from the vendees to Edwards, Sandford & Co. as to their shipment from that place. But the employment by the vendees of a carrier from Liverpool, and deferring instructions as to shipment from there until the goods should arrive, did not create a new transit from that point. If the destination of the goods, as understood between the vendors and vendees, was New-York, the transit and right of stoppage continued to New-York, entirely unaffected by the consideration that the vendors employed the carriers for part of the route, and the vendees as to the residue. A transit may be single and entire, and yet carriers be employed for different stages of the route as they are needed, with directions as to the carriage to each carrier, and knowledge by him as to their ultimate destination limited to the distance he is to carry. The extent of the transit does not depend upon the direction or address of the goods, in a shipping bill or otherwise, or any information to the carrier, but only upon the purpose of the buyers communicated to the sellers, unless some change of purpose occurs. When directions as to the carriage, for part of the distance the goods are to be taken, are delayed and subsequently given, a new motion is not by the new instruction impressed upon the goods, as that language is used in some of the cases. The original motion continues although the employment of new carriers and new instructions may be necessary from time to time in the course of the transit. A new motion takes place only when, after goods have reached their original destination, they are started to another destination. Those words express only a secondary transit. We must find such a transit before we can say a new motion has been given to the goods. Inquiry for a new motion is inquiry for a new transit. They are the same thing.

Most of the cases referred to by the defendant's counsel, are in harmony with the views above expressed. Some of

them, holding the transit ended by a delivery of the goods to an agent, are cases of a clear agency in the person to whom they are delivered to receive or hold them for the owners with the like effect as if delivered absolutely to the owner, and not as a mere carrier or middle-man. Such are *Leeds* v. *Wright*, (3 *Bos. & Pul.*, 320); *Scott* v. *Pettit*, (*id.*, 469); *Bassett* v. *Goddard*, (3 *Mason*, 107); *Meletopulo* v. *Ranking*, (1 *N. Y. Legal Ob.*, 299); *Wright* v. *Lawes*, (4 *Esp. R.*, 82); *Foster* v. *Frampton*, (6 *Barn. & Cres.*, 107); *Rowe* v. *Pickford*, (8 *Taunt.*, 83); *Fowler* v. *Kymer*, (cited 3 *East*, 396); *Gerard* v. *Nightingale*, (*Cross. on Lien*, 412); *Dodson* v. *Wentworth*, (4 *Man. & Gr.*, 1080); *Sawyer* v. *Joslin*, (20 *Verm. R.*, 172); *Allen* v. *Gripper*, (2 *Cromp. & Jer.*, 218); *Richardson* v. *Goss*, (3 *Bos. & Pul.*, 119); *Wentworth* v. *Outhwaite*, (10 *Mees. & Wels.*, 436); *Hayes* v. *Mouille*, (14 *Penn.* (2 *Harris.*,) 48). In the other cases the distinction stated by Chancellor Kent is virtually recognized, but they are less clear in regard to the agency of the persons receiving the goods being so extensive. *Dixon* v. *Baldwin*, (5 *East*, 154); *Valpy* v. *Gibson*, (4 *Man. & Gr.*, 837); *Biggs* v. *Barry*, (2 *Curtis C. C. R.*, 259); *Bolin* v. *Huffnagle*, (1 *Rawle*, 9). Whatever discrepancy exists between cases seems to be, generally, in the application of rules which are conceded.

The case of *Hitchcock* v. *Covill*, (23 *Wend.*, 611) in the late Court of Errors is in principle directly in point in favor of the vendors in this case. The plaintiff residing in New-York sold goods to the vendee residing at Willardsburgh Pennsylvania, and in pursuance of instructions boxed and directed the goods to the vendee at his residence and put them on board a canal boat. Havana, about thirty miles from Willardsburgh was the head of navigation in that direction and the course of business was to deposit goods brought by canal at Havana, the warehousemen keeping the goods until called for; there being no public carriers beyond that place. The goods arrived at Havana and were put in a warehouse. The plaintiff then stopped the goods, claiming

Harris *v.* Pratt.

a right of stoppage in transitu. The right was sustained; the only opinion delivered in the case was by the chancellor which is placed on the sole ground that the right to stop the goods in transitu still existed and was duly exercised. On that ground he was in favor of an affirmance of the judgment of the Supreme Court which was for the plaintiff on another ground ( 20 *Wend.*, 167 ) and the judgment was affirmed by a vote of fourteen to two. As nothing appears to the contrary it must be understood that the opinion was concurred in by all the members of the court who voted for affirmance. In that case the goods were marked for Willardsburgh thereby showing that was their destination; but marks are only evidence on the subject. The evidence in the present case, that the destination of the goods was New-York, is as conclusive as if they had been marked for that city. In that case, as in this, further instructions were required at the intermediate point to start the goods from there for their destination. In neither case was any new motion necessary; a continuance of the original motion alone was required. The chancellor comments on the case of *Dixon* v. *Baldwin* and distinguishes it from the case in the Court of Errors. In this connection I refer again to *Buckley* v. *Furniss* and *Mottram* v. *Heyer* before cited.

The following cases also strongly sustain the views above stated. *Ellis* v. *Hunt*, ( 3 *T. R.* 465 ); *Bohtlingk* v. *Inglis*, ( 3 *East*, 395 ); *Mills* v. *Ball*, ( 2 *Bos. & Pul.*, 457 ); *Smith* v. *Goss*, ( 1 *Camp.*, 282 ), *Tucker* v. *Humphrey*, ( 4 *Bing.*, 516 ); *Aguirre* v. *Parmelee*, ( 22 *Conn.*, 473 ); *Nichols* v. *LeFeuvre*, ( 2 *Bing. N. C.*, 81 ); *Jackson* v. *Nichol*, ( 5 *id.*, 508 ); *Coates* v. *Railton*, ( 6 *Barn. & Cres.*, 422, 1 *Mees. & Wels.*, 21 ); *Whitehead* v. *Anderson*, ( 9 *Mees. & Wels.*, 518 ).

Another point made by the defendants is that they as assignees of the vendees had taken possession of the goods at New-York before the right of stoppage was exercised. They had made an entry of the goods, which remained on board the ship, at the New-York custom house. As assignees for the benefit

of creditors, they occupied the place of their assignor with no greater rights. A mere entry at the custom house, without paying duties and obtaining a permit, was not enough to entitle them to actual possession. *Mottram* v. *Heyer*, (5 *Denio*, 629).

In my opinion the judgment of the Supreme Court should be affirmed.

COMSTOCK, J., dissented: all the other judges concurring,

Judgment affirmed.