## Reynolds v. Boston and Maine Railroad.

A general exception to the charge of the court is not sustainable. Exception should be taken to the particulars objected to.

It is not necessary for the party stopping goods *in transitu*, to show that the consignee failed after the contract. It is sufficient if his failure becomes known after the sale.

Any agent, authorized to act for the consignor, either generally or in relation to the consignment in question, may stop goods *in transitu*, without any authority to adopt that particular measure.

In case of questions arising, the carrier has the right to a reasonable time to ascertain the facts, and the agent to produce his authority and to furnish an indemnity.

The right of stoppage terminates only with an actual delivery, unless the carrier consents to hold the goods for the consignee, or wrongfully refuses to deliver them.

A notice to the carrier not to deliver the goods is enough ; a demand of delivery is not necessary.

Direct proof of insolvency is not necessary ; it may be proved by circumstances.

Trover, for twenty sewing-machines, of the value of $500.

The plaintiff testified that he was a machinist, living at Dover; that in 1860 he manufactured-sewing machines ; that he received a letter purporting to be from D. Murcheson & Co. ; subsequently a man by the name of White, who said he belonged to that firm, purporting to do their business at No. 4, India wharf, Boston, appeared at Dover, and negotiated for twenty machines, at $25 each. He says, "I consented to a discount of four per cent, and to take one half cash ; the balance in a check at thirty days. They were to be delivered in Boston, to be sent there by railroad, and to be paid for on delivery. They were delivered at the depot of the defendants, in Dover, on the evening of the 15th of October, and W. Tredick gave his receipt to the plaintiff, as follows :

"Received of O. L. Reynolds, at the depot of the Boston and Maine Railroad, to be forwarded by railroad to Boston, Mass., the following articles : namely, 14 cases sewing-machines, marked [M] ⋈ Houston, Texas, care D. Murcheson & Co., Boston, Mass.　　W. Tredick.

Dover, N. H., Oct. 15, 1860."

On the same day I made a bill of sale of said machines, as follows :

"Messrs. D. Murcheson & Co., to O. L. Reynolds,　　　　　　　Dr.

| | | |
|---|---|---|
| 1860, Oct. 15. To 20 new style *ne plus ultra* double thread | | |
| sewing-machines, at $25 each, | | $500.00 |
| Discount for cash, 4 per cent, | | 20.00 |
| | | $480.00 |

Received pay,　　　　　　O. L. Reynolds."

On the evening of the same day I wrote to Messrs. Niles & Co., expressmen, the following instructions, which were on the same paper as the bill of sale :

"Messrs. Niles & Co., Gentlemen—Above please find bill sewing machines forwarded to Messrs. D. Murcheson & Co., No. 4, India wharf, Boston, Mass., with railroad receipt. Messrs. D. Murcheson & Co. will give you cash $240, and check $240, at thirty

days, for the balance, which you will be kind enough to bring to me to-morrow evening, and oblige yours, &c.          O. L. REYNOLDS.

Dover, Oct. 15, 1860."

He testified that on the morning of the 16th he saw Mr. Niles at the depot, before the train started, and gave him the bill for collection against Murcheson & Co., and gave him verbal directions to call early upon said firm, and collect the bill, and see that the machines were not delivered, if possible, until he got his pay. He said he expected White to pay the freight, and that he had never received a dollar for his machines, nor their return, nor has he been able to find D. Murcheson & Co.

D. Niles testified that he took the receipt and bill for collection to Boston on the 16th, and gave them to his man, Carleton, for collection. That Carleton returned them to him about 11 o'clock A. M., without money, or check; that he, in the afternoon of the same day, about fifteen minutes before 3 o'clock, taking the train at 3 for Dover, directed Otis Robinson, who was one of the men in his employment, to go down to the freight depot of the defendants, and tell the men there to hold on to the machines till he could see Reynolds and bring word the next morning. His train usually arrived at Boston between 8 and 9 o'clock, and returned at 3 P. M.

Robinson testified that, upon receiving directions from Niles, he, about 3 o'clock of the same afternoon, went first to the delivery clerk of the freight department, and inquired about the machines; that he was informed by the clerk that they had arrived that day, and that the parties had come for them, but they had not been delivered. He said the parties seemed to be in a great hurry to get them, and that they had paid the freight on them, and got their delivery check. He said he could not deliver them, as there were other things in the way. He would have the things removed, and be ready to deliver the machines at 5 o'clock that afternoon. I told him Mr. Reynolds had sent the bill for collection by Niles & Co., and that the parties had agreed to pay half in money and half in a note for thirty days; but they would not pay the money. Mr. Niles wanted him to hold on to the machines till he could hear from Dover. He said he could not do any thing about it; I might go into the office. I then immediately called on Mr. Pattee, the brother of the delivery clerk, who had the care of the inside freight office, and told him in substance as I had before stated to his brother, and of the request of Mr. Niles. He said he could not do any thing about it, but I had better go over and see Mr. Merriam, the master of the freight department. I then went to him and told him my errand, that Reynolds of Dover had sent a lot of machines to a firm in Boston, and also a bill for collection by Niles & Co.; that the parties had agreed to pay half in money and half in a note; that they would not do it; that they would not pay but a very small sum of money; that Niles & Co. would not give up the papers, or settle with them, unless they complied with the terms; that Mr. Niles wanted them to hold on to the machines till he could hear from Dover, or from him, I am not certain which. I think Merriam asked me if they had paid their freight. I told him they had, and

were coming after the machines at 5 o'clock. He said if they had paid their freight and got a check he did not know as he had any right to hold the machines. He asked me the amount of the bill, and I told him. He said he did not see as the machines could be held without process of law, which could be taken just as well after they were delivered as before. I told him I knew nothing about that, but Mr. Niles wanted me to make the request I had made of him. Mr. Merriam asked me if I did Mr. Niles' work. I told him I did. He asked me for no papers. The conversation was about fifteen or twenty minutes past 3 o'clock P. M., of the 16th of October. The third interrogatory to Robinson was as follows: "Did Mr. Merriam request you to go and see Mr. Niles in regard to the matter, and get authority? Answer. I think he told me I might tell Mr. Niles about it. I told him Mr. Niles had gone to Dover. I did not have the papers in my possession. Mr. Merriam told me the Railroad would be glad to do all they could for us, but he did not see as they could do any thing without getting themselves into trouble."

The delivery check referred to was as follows:

"BOSTON, Oct. 16, 1860.

Received, in good order, of the Boston and Maine Railroad Co., consigned to D. M. & Co., from Dover; namely,

14 box machines.

Delivered by order of A.

D. Murcheson & Co.,

By White."

Upon this evidence the defendants moved for a nonsuit, but the motion was overruled.

Mr. Pattee testified for the defendants. He said he was freight cashier for them. He recollected of some one making inquiry, the same afternoon the machines arrived in Boston, if the machines could not be detained. The freight train usually arrives at Boston about noon. The freight had been paid on the machines when inquiry was made by the man of me. The freight bill was $3.71. He showed the way-bill. He sent the applicant to Mr. Merriam, the freight agent, for further information.

W. J. Merriam says he was freight agent for 1860, and since. On the 16th of October, 1860, a young man came to my office and told me that Mr. Niles had sent him to request me to stop some sewing-machines. I asked him if the freight had been paid. He said it was, and that the parties would soon be there after the goods. I told him I thought he was too late—should be glad to help him if I could. I asked him whether, if I would do any thing for him, he would hold us harmless. He said he had no authority to bind any one, and refused to bind himself. I advised him to telegraph at once to Dover for authority; told him he could get possession by legal process in the hands of others, as well as ours. He said he worked for Niles. He was a teamster—a laboring man; rather a young, ordinary looking man. I did not feel willing to act on his

representations. White and one or two others had been there after the goods. They blustered about considerably, complaining because the goods were not delivered to them. I delivered the machines myself at 5 P. M. Saw the receipts signed D. Murcheson & Co., by a man calling himself White. I asked Robinson to indemnify us, so that we might have some one to lean upon. I never saw Niles until yesterday.

The plaintiff also showed a special demand upon the president of the railroad, after the alleged conversion, but before the commencement of the suit.

The court told the jury that they must find either a general or special property in the plaintiff, in the goods he claimed, at the time of the alleged conversion. The most material point of inquiry was, whether the delivery of the machines to the vendees by the defendants constituted a wrongful conversion of them.

The plaintiff contended that the contract between him and Murcheson & Co. was executory or conditional, vesting no property in the vendees until the payment of the price of the machines at Boston. The jury might regard the contract as having been so far perfected, by the delivery of the machines to the defendants, as common carriers, at their depot at Dover, as would pass the property to the vendees. But the contract was of such a nature as to give the plaintiff a right to exert his equitable lien, or to obtain the benefits of the law of stoppage *in transitu.* To have this right or privilege, he must satisfy the jury that the goods were delivered on a credit, and they must be satisfied also of the insolvency of the vendees, and that this was not known to the plaintiff at the time of the bargain with White in behalf of the firm. If the plaintiff knew of the insolvency of the vendees at the time of the bargain, he could not maintain this action. The jury would examine the evidence, and see whether the plaintiff had knowledge of the insolvency of the vendees, prior to the day of delivery at Boston. Having obtained knowledge of their insolvency, or of their failure to meet their contract, he, or his agent, might take immediate measures to reclaim his property by stopping its delivery to the vendees. This right continued in the plaintiff up to the time of its final delivery, or up to the time when the vendees acquired complete dominion over the machines. The plaintiff was bound to the exercise of due care and diligence on his part, and to show that he seasonably, or within a reasonable time, notified or requested the defendants, or their officers or servants, who had then the immediate charge or custody of the goods, not to deliver them to the vendees. The defendants had a right to require due authority in him who gave the notice. The plaintiff had a right to delegate his authority to Niles, and it was for the jury to find whether he had acted within the scope of his agency. In this case it was competent for Niles to delegate his authority to another, and the jury were to inquire if Robinson had properly executed his trust. The payment of the freight and the delivery of the check could not legally prevail against the request of the owner to hold on and not deliver the machines. When the law imposes duties, it gives a reasonable

time within which they may be discharged.  In cases of doubt and conflict of title the defendants, as public carriers, were entitled, before delivery to the vendor or vendee, to indemnity from loss.  In this case, after notice, the defendants were put upon inquiry, and were bound to the exercise of due diligence in prosecuting this inquiry.  The freight officer might have consulted with the superintendent of the road, or the more competent legal officer, the president of the corporation; or might have required more or better evidence of title from the vendees, before delivery of the machines. That the law would give the plaintiff a reasonable time in which to furnish his requisite indemnity, and in the mean time would protect the public carrier from harm, and always while the parties are in the faithful discharge of duty.  Was it unreasonable, in this case, to ask for delay until the next day, for the action of the vendor in the premises ?  And did the defendants exercise due diligence, or due care and caution, in delivering the goods in the manner and at the time they did ?  If the jury found the defendants managed wrong, and to the prejudice of the plaintiff's rights, in surrendering the property, the plaintiff would be entitled to maintain this action for the value of the goods and interest from the time of the conversion. As the plaintiff made a special demand upon the defendants some time after the 16th of October, 1860, the jury might cast interest from the day of the demand.

The defendants requested the court to charge the jury that the plaintiff was not entitled to maintain this action until he first paid or tendered to the defendants the amount of the freight from Dover to Boston.  The court gave the instruction that the plaintiff was not bound to pay or tender the freight money, it having been paid by the vendees.

The jury returned a verdict for the plaintiff, and the defendants excepted to the charge of the court, and moved for a new trial.

*Christie & Kingman,* for the defendants, contended that the only right which the plaintiff could exercise over the goods was that of stoppage *in transitu,* there being no fraud shown in the contract, and the sale being unconditional.  In order to entitle the plaintiff to stop the goods *in transitu,* it is necessary for him to prove that the vendees became insolvent between the time of the contract and the time of the delivery.  1 Pars. on Cont. 478 (3d Ed. and notes); Hill. on Sales, 210 ; *Rogers* v. *Thomas,* 20 Conn. 53.  Carleton's testimony was not offered.  There is no evidence the bill was presented to Murcheson & Co., nor that Murcheson & Co. are not responsible now.  If Carleton called on them, it was before the goods arrived, and they were not bound to pay.  It was the duty of Reynolds to have an agent to receive the money when the goods were delivered.  The expressman had no authority to stop the delivery of the goods, and did not understand that he had any authority to do so.  If he had, he would understand he must be at the depot and stop the delivery, if the goods were not paid for ; as he had no authority, he wants them to wait till he gets authority ; as he had no authority, what was done is of no avail, unless adopted, which

is not shown. The notice which Niles sent to the defendants was insufficient to bind them, because it was too late, the goods having come under the control and into the constructive possession of the consignees; because it was made without authority, and the right to make it questioned at the time; and because he should have demanded the delivery of the goods to himself for the plaintiff, and not have required the defendants to assume new risks and responsibilities in relation to them. Redf. on Railw. 303, sec. 2; Long on Sales 307, 308. A prohibition to deliver the goods was not enough. The goods must remain at the risk of the railroad. They were not bound to incur that risk. A request to keep the goods was not a stoppage *in transitu.* A friend, having no authority, can do nothing, unless there is a ratification before the goods are delivered. No ratification is shown here but this action. Payment of the freight was a new consideration, and its receipt a new agreement to deliver the goods to the consignees.

The act of the expressman, not having been expressly authorized by the plaintiff, could not be ratified by him subsequently, because the *transitus* was ended, and the goods delivered before he could make the act his own. 1 Pars. Cont. 45, note (tt), and 478, note (m); *Bird* v. *Brown,* 4 Exch. 786.

This was not a sale on credit, but for payment on delivery; consequently no right of stoppage *in transitu* existed. The goods became the property of the purchaser on delivery to the carrier, and the plaintiff's lien for the price was lost by that delivery. In such cases the right of stoppage never exists. 1 Pars. Cont. 440, and note; Long. on Sales 262; Abbot on Shipping 351.

The court instructed the jury that they must find either a general or special property in the plaintiff in the goods claimed by him; and it is to be presumed that they so found. But in that event no right of stoppage *in transitu* could exist. One can not charge a common carrier on that ground for his own property. 1 Smith L. C. 539.

The court instructed the jury that they might examine the evidence, and see whether the plaintiff had knowledge of the insolvency of the vendees, prior to the day of delivery in Boston; but there was no evidence from which the jury could find that fact, and the conduct of the plaintiff, in sending his bill to them on that day for payment, together with his written instructions to the expressman, clearly shows that he had no such knowledge. The jury should, on the contrary, have been charged that the plaintiff must prove the fact of such insolvency after the time of the sale, in order to maintain his action. 2 Kent Com. 543, and note; Abbot on Shipping 370, and note.

But the court further charged, that the plaintiff, having obtained knowledge of the vendees' insolvency, or of their failure to meet their contract, he or his agent might stop the goods. The charge should have been that this right exists only in case of the insolvency of the vendee. 2 Kent Com. 543; Long on Sales 308; Hill. on Sales 188, sec. 1; Story Cont., sec. 519.

The court, after saying to the jury that the plaintiff was entitled

to a reasonable time to furnish the requisite indemnity to the carrier, and that it would not be unreasonable to ask for delay until the next day, that the vendor might have time to take action in the premises, instructed the jury that if they found that the defendants managed wrong, and to the prejudice of the plaintiff's rights, in surrendering the property, they would be chargeable for the value of the goods; virtually saying that if it should turn out that the plaintiff had made a bad bargain, and that it would prejudice his interests to have the goods delivered according to his order, and according to the contract made with the carrier, the defendants must pay him the value of the property.

The court should have charged the jury, that the plaintiff was bound to tender the freight before he could maintain this action. Ang. on Carriers 337, sec. 339.

*L. D. Sawyer*, and *Woodman*, for the plaintiff.

The property in these goods never passed from the plaintiff; he had a right to reclaim and seize them any where. *Dudley* v. *Sawyer*, 41 N. H. 326; *Ferguson* v. *Clifford*, 37 N. H. 86, 103; *Luey* v. *Bundy*, 9 N. H. 301; *Clark* v. *Draper*, 19 N. H. 419; *Williams* v. *Moore*, 5 N. H. 235; *Sargent* v. *Gile*, 8 N. H. 325; 1 Pars. Cont. 449, sec. 6; *Saltus* v. *Everett*, 20 Wend. 267. Murcheson & Co. had no right to the possession of the goods without payment for them, either antecedent to or concurrent with the delivery. 1 Pars. Cont. 449, 479, note (g); *Low* v. *Freeman*, 12 Ill. 467; *Jenness* v. *Gage*, 13 Ill. 510. The defendants being notified of the trade, and forbidden to deliver the goods, the delivery was wrongful, and at their peril. Redf. on Railw. 304, 306, 307; Abbot on Shipping 636, note (t), marg. p. 529; *Walker* v. *Woodbridge*, Cook B. L. 494; *Mills* v. *Bull*, 2 B. & P. 457; *Newhall* v. *Vargas*, 13 Me. 93. The taking of the goods by Murcheson & Co. was a fraud upon the plaintiff, of which the defendants were notified. The receipt of the freight was in no sense a delivery of the goods. *Townley* v. *Crump*, 4 Ad. & El. 58. If it was a constructive delivery, the defendants were seasonably notified of the fraud of Murcheson & Co. in procuring such delivery, and were bound to retain the actual custody of the goods against a receipt so obtained. *Jenness* v. *Gage*, *ante*. The defendants would be protected in a reasonable delay, for the purpose of making inquiry into the facts, and allowing the contracting parties time to furnish an indemnity; and, being thus protected, this wrongful delivery, hastily and wantonly made, was at the defendants' peril. Redf. on Railw. 304, note; *Robinson* v. *Burleigh*, 5 N. H. 225; *Fletcher* v. *Fletcher*, 7 N. H. 452; *Sargent* v. *Gile*, 8 N. H. 331.

The contract of the defendants with the plaintiff is expressed in the bill of lading, by which the machines were sent to the care of D. Murcheson & Co. This imported no sale of the machines to D. Murcheson & Co., but rather implied that the consignor was the general owner of the goods. D. Murcheson & Co. should have had and presented the bill of lading—something to show themselves to be the consignees. To whom the goods were delivered does not appear, except that it was to a man calling himself White. The

defendants' freight agents at Boston were bound to know the terms of the bill of lading, which was given to the plaintiff by their clerk at Dover.

The contract of the plaintiff with Murcheson & Co. was a contract for a sale. Delivery was necessary to pass the property. There was no credit preceding the delivery. The delivery of the goods by the plaintiff to the defendants at Dover was not even a qualified delivery to Murcheson & Co. It is wholly unlike a case of sale on credit, and a delivery by the vendor to a common carrier. It is not, therefore, necessary for the plaintiff to rely upon the technical right of stoppage *in transitu*, in case of the insolvency of the vendee. The plaintiff's right of stopping the goods existed independently of any insolvency of Murcheson & Co. The ruling, in this respect, was too favorable to the defendants. But if it were necessary for the plaintiff to rely upon that technical right, he might claim to exercise it in this case. There was some evidence, slight indeed, that Murcheson & Co., at the time of their contract, doing business on India wharf, in Boston, were apparently solvent; that the plaintiff, relying upon such representation, had a right to suppose them to be solvent. They were *primâ facie* solvent. Their refusal to pay for the machines, according to the contract, was some evidence that they had become insolvent. Stoppage of payment is held sufficient evidence of such fact. Their refusal to pay the plaintiff's bill, corroborated by attending circumstances at the time, would justify the jury in finding an insolvency to exist, which would allow the stoppage *in transitu*. The plaintiff has not since been able to find D. Murcheson & Co., nor have the defendants indicated where they are. Upon this evidence the verdict is conclusive.

The plaintiff had also the right to stop the goods on discovery of fraud in the vendee. 1 Pars. Cont. 476, note 1, and 484; citing *Donath* v. *Brownhead*, 7 Penn. 301. Niles had authority to notify the defendants not to deliver the machines. His instructions were to see that the machines were not delivered, if possible, until he got payment for them. Merriam knew that Niles came from the plaintiff as his agent.

It was the agreement or understanding of the plaintiff and White that the machines were to be sent by railroad. It does not appear that it was by the direction of White, nor does it appear that there was an express agreement that White was to pay the freight. The plaintiff testified that he expected him to pay the freight. If White had agreed to pay the freight it would have only amounted to this, that Murcheson & Co. agreed to pay $480, and the freight charged, on delivery of the machines to them at Boston, as a consideration for the plaintiff's agreeing to send them to Boston, and there deliver them to the vendees.

The goods, while *in transitu*, were at the risk of the plaintiff, and not of Murcheson & Co. 1 Pars. Cont. 446.

The payment of the freight by White did not divest the plaintiff of any of his rights. *Buskirk* v. *Purinton*, 2 Hall 561.

BELL, C. J.   The evidence in this case tends to prove that the contract between the parties was conditional that the machines should be delivered in Boston on payment of the price; and this evidence is entirely uncontradicted.   Upon such a contract it may be regarded as settled that no interest vests in the purchaser until actual delivery and the payment of the price.   The payment is a condition precedent to the passing of the title.   The contract is merely executory.   Notwithstanding a delivery to a common carrier, to be forwarded to the buyer, the title remains in the seller, and his right to forbid a delivery by his bailee remains absolute till the payment is made.   *Williams* v. *Moore*, 5 N. H. 235; *McFarland* v. *Farmer*, 42 N. H. 386; *Dudley* v. *Sawyer*, 41 N. H. 326; *Ferguson* v. *Clifford*, 37 N. H. 87; *Messer* v. *Woodman*, 22 N. H. 172; *Goodall* v. *Shelton*, 2 H. B. 316; *Luey* v. *Bundy*, 9 N. H. 301.

The plaintiff claimed at the trial, and still insists, that this is the true view of the case.   If the verdict had been against him, it seems to us he might have had a well-founded objection to it.   But he can take no objections to a verdict which he seeks to sustain. The defendant can not object that this view of the case was not dwelt upon by the court, because the omission is only too favorable to himself.   *Fowler* v. *Tuttle*, 24 N. H. 9.

The objection taken to the charge of the court, in general terms, is not sustainable.   It is quite too broad.   If any part of the instructions to the jury was regarded as objectionable, the exception should be taken to that specifically.

We propose, however, to examine some of the points raised in the argument, as it may save the parties the expense of a new trial.

The defendants contend, that to entitle the plaintiff to stop the goods *in transitu*, he must prove that the vendees became insolvent between the time of the contract and the time of the delivery; while the charge imported that the right would exist, if the plaintiff obtained the knowledge of their insolvency, or of their failure to meet their contract, between those times.   They rely on the decision in *Rogers* v. *Thomas*, 20 Conn. 53, quoted 1 Pars. on Cont. 478, in which this point is explicitly held; but we are unable to adopt this view of the law, because we do not find any decision in which the right is held to depend on a failure after the sale, until this case; because it is laid down generally in the elementary books and decided cases, as depending on the fact of insolvency, first known before the time of delivery; because the doctrine was originally equitable, and should extend to all cases falling within the same reason, and a peremptory rule which would exclude from this right a large class of cases where its benefit is quite as important and necessary as in any other, must be supported on strong grounds of principle, or by decisions too numerous and too well supported to be shaken, and the case relied on rests on neither of these; because we are unable to discover any just or equitable reason for distinguishing between the case of the merchant here, forwarding goods upon the order of a distant correspondent, who discovers that his consignee failed the day before his order was received, and the case where he discovers that the failure occurred the day after the order was executed; and

finally, because we think the decisions, in which it is held that it is enough that the failure of the consignee became known to the consignor after the goods were sold or forwarded, are of greater weight.

In *Snee* v. *Tollet*, 1 Atk. 245, *Hardwicke*, C. J., says: "If goods are delivered to a carrier to be delivered to A, and while the carrier is upon the road, and before actual delivery to A by the carrier, the consignor hears that A, his consignee, is likely to become a bankrupt, or is actually one, and countermands the delivery, and gets them back into his own possession again, I am of opinion that no action of trover would lie for the assignees of A, because the goods, while they were *in transitu*, might be so countermanded."

In *Buckley* v. *Furniss*, 15 Wend. 137, Buckley sold to Titus on credit, and subsequently discovering him to have been insolvent at the time of the sale, he had repossessed himself of the iron, under the right of stoppage *in transitu*. It was shown that the sale took place in 1853, and that the vendee had failed in New-York in 1829, and the vendor knew that fact, but he did not know that he had remained insolvent since; and the vendee afterward transacted business in the country, represented that he was largely interested in real estate, and the vendor had previously sold him goods, and been promptly paid, and was ignorant of his being much in debt, and of his securities having been protested; and it was held that he had no sufficient notice of his insolvency to prevent the exercise of the right of stoppage. See Hill. on Sales 218, sec. 11.

In *Bohtlink* v. *Inglis*, 3 East 380, the goods were ordered by a London merchant of a merchant at St. Petersburg. They were purchased before the 16th, the day on which the London merchant became bankrupt, and were loaded, and one part of a bill of lading forwarded on the 18th, and the goods were stopped *in transitu* after the consignor heard of the insolvency; and it was not suggested that the right of stopping the goods was impaired by this state of facts.

In *Stevens* v. *Wheeler*, 27 Barb. 663, *Ingraham*, J., says: "From all these cases, and I can find none sanctioning a contrary doctrine, the following rules are deducible: namely, that the vendor has a right to stop goods sold by him when he discovers the vendee to be insolvent at any time while the goods are *in transitu*.

The same principle is stated in the same terms in Cross on Lien and Stoppage 361; Hill. on Sales 218; Redf. Railw. 303; and see 1 Pars. Cont. 478.

It is contended that the attempt to stop the goods was made without authority. Though goods can not be stopped *in transitu* by a stranger, absolutely without authority, and the act of such mere stranger can not be made valid by a ratification on the part of the vendor, or his agents, subsequent to the time when the goods reach the hands of the vendee (*Bird* v. *Brown*, 4 Exch. 786), yet we regard it as settled that any agent who has power to act for the consignor, either generally or for the purposes of the consignment in question, may stop goods *in transitu* without any authority specially directed to that end, or empowering him to adopt that

particular measure. *Bell* v. *Moss*, 5 Whart. 189; *Newhall* v. *Vargas*, 3 Shep. 93; *Whitehead* v. *Anderson*, 9 M. & W. 518; 1 Pars. Cont. 478; Cross on Lien, 364; Hill. on Sales 210; 1 Smith L. C. 907. Here the expressman had an authority to act in reference to this particular subject. He was instructed to call early upon the vendees, and collect the bill, and see that the machines were not delivered, if possible, until he got the pay. His acts are now claimed by the plaintiff to have been done by his authority, and no special ratification was needed to render them effectual. It was of no importance whether the expressman supposed he had authority or not. The question depends upon the fact of his authority, and not on his opinion.

It is said the notice given to the carriers not to deliver the goods was insufficient, because the authority of the messenger was questioned at the time. There was room for doubt whether the jury would have found that any such question was raised. But we think the defendants would be protected in a reasonable delay, for the purpose of making proper inquiries into the facts, and for allowing the claimants time to produce their authority, and to furnish an indemnity. They were bound to know their own contract, and to regard the directions placed upon the goods themselves. Both these imported that the goods were sent to the care of Murcheson & Co., not that they were sold to them. The case does not show that any inquiries were made as to the persons to whom the goods were delivered, or as to the title they had to them; and we think that, under the circumstances, they were bound to retain the goods, and a delivery after the notice given them was at their peril.

It is insisted that the notice was insufficient, because it was too late, and because a delivery should have been demanded to the messenger. The goods had been called for by the persons who claimed to be the consignees, the freight was paid by them, and a delivery check, as it is called, was given them. This was merely a receipt for the goods to be signed by them, and left with the clerk who had charge of the goods, upon their receipt of them. They were not delivered to nor seen by the claimants. There were other things in the way of a delivery, and they were told they would be ready about five o'clock. If these constituted a delivery in law, so as to terminate the *transitus*, the notice given in behalf of the plaintiff was too late. It was long held that the right of stoppage *in transitu* could be terminated only by an actual delivery of the goods to the consignee or his agent. Cross on Lien 370; *James* v. *Griffin*, 2 M. & W. 623; *Edwards* v. *Brewer*, 2 M. & W. 375; *Ellis* v. *Hunt*, 3 T. R. 404; 2 Kent Com. 545; 1 Smith L. C. 907. The later cases furnish some exceptions to this rule, as where the consignee calls for the goods, and the carrier agrees or consents that he will hold them for him, thus making himself his agent to keep the goods; *Richardson* v. *Goss*, 3 B. & P. 127; *Scott* v. *Petit*, 3 B. & P. 469; *Molloy* v. *Hay*, 3 M. & R. 396; *Rowe* v. *Pickford*, 1 Moor 526; *Allan* v. *Gripper*, 2 C. & J. 218; or where the consignee has been in the habit of using the warehouse of the carrier

or wharfinger as his own; *Tinker* v. *Humphrey*, 4 Bing. 521; *Foster* v. *Frampton*, 6 B. & C. 109; or where the consignee claims the goods, and the carrier wrongfully refuses to deliver them, so that he makes himself liable for the goods in trover. *Bird* v. *Brown; Walley* v. *Montgomery*, 3 East 585. But where the goods remain in the actual possession of the carrier, without fault on his part; *Crawshay* v. *Eades*, 4 B. & C. 181; *Tucker* v. *Humphrey*, 4 Bing. 516; *Holst* v. *Pownal*, 1 Esp. 240; *Lackington* v. *Atherton*, 8 Scott N. S. 38; or in the hands of a depositary, or in the custom-house till the duties are paid; *Matham* v. *Heyer*, 5 Denio 629; *Newhall* v. *Vargas*, 13 Me. 109; *Northry* v. *Field*, 2 Esp. 613; or until necessary papers are produced; *Donuth* v. *Broomhead*, 7 Barr 381; or while the vessel is lying at quarantine; *Stoveld* v. *Hughes*, 14 East 308; there is no delivery, either actual or constructive. Goods can not be said to have arrived at their final destination, so as to defeat the vendor's right of stoppage, while they remain in the hands of the wharfinger or carrier in that character, provided he is not the actual agent of the consignee beyond his duty as a mere wharfinger or carrier. *Bertram* v. *Fairbrother*, 1 M. & P. 528; *Jackson* v. *Nichol*, 5 Bing. N. C. 508; *Atkins* v. *Colby*, 20 N. H. 156.

There is no constructive possession on the part of the vendee, unless the relation in which the carrier stood before, as a mere instrument of conveyance to an appointed place of destination, has been altered by a contract between the vendee and the carrier, that the latter should hold or keep the goods, as the agent of the vendee. *Foster* v. *Frampton*, 6 B. & C. 107; *Whitehead* v. *Anderson*, 9 M. & W. 508.

In the present case there is no evidence of any such agreement. The consignees were in a great hurry, and complained that the goods were not delivered to them. They asked no agreement to keep the goods for them, and no assent was given to any such agreement, if we were to assume that the agents had authority to make any. The delivery check was no special agreement, and implied none, since it was but the usual mode of doing their business. The case comes not nearly up to *Foster* v. *Frampton*, 6 B. & C. 107, where it is said there is no proof of any such contract (to keep the goods). A promise by the captain of the vessel to the agent of the assignees is stated, but it is no more than a promise, without a new consideration, to fulfill the original contract, and deliver in due course to the consignee, on payment of freight, which leaves the captain in the same situation as before. After the agreement he remained a mere agent for expediting the cargo to its original destination.

A notice to the carrier not to deliver the goods is sufficient. It is not necessary that the vendor or his agent should demand a delivery of the goods to himself. *Lett* v. *Cawley*, 1 Taunt. 606; *Whitehead* v. *Anderson*, 9 M. & W. 518; *Bell* v. *Moss*, 1 Whart. 189.

It is insisted that the court, having instructed the jury that they must find a general or special property in the goods in the plaintiff, they must be presumed to have found such property, and in that case no right of stoppage *in transitu* exists; and that, further, this

was not a sale on credit, but for payment on delivery, and no such right of stoppage exists in that case; that the charge that the plaintiff, having obtained knowledge of the vendees' insolvency, or of their failure to meet their contract, he or his agent might stop the goods, was erroneous. The right to stop the goods *in transitu* exists only in case of the insolvency of the vendees.

These questions all rest on a technicality. The question really is, whether the plaintiff had a right to stop these goods, and not whether such stoppage would fall within the strict technical meaning of stoppage *in transitu*. Ordinarily, goods sold to an absent party pass to the vendee by a delivery to the carrier, and are at his risk, and become his property for all purposes, except that they remain liable to be stopped *in transitu* while on the way. But if, by reason of a condition precedent, as the payment of the price on delivery, they did not pass by the delivery to the carrier, but remained as they must the property and at the risk of the original owner, his right to countermand the delivery of the goods on their way would be perfect and absolute, and the proposed buyer could have no claim whatever to them, till he had paid the price; and the carrier would be bound by an order to detain the goods on the insolvency of the consignee, or on his failure to meet his contract. The rule, therefore, laid down to the jury was the correct one, whether the case was one of stoppage *in transitu*, technically speaking, or of stoppage on the way by the owner; saving that in the latter case the conditions upon which the right of stoppage *in transitu* depends, would have no application. But the defendants, can not complain of the omission to state that difference, if such omission occurred, because it would render the charge only too favorable to themselves.

The instruction that, to maintain the action of trover, the plaintiff must show a general or special property in the goods, was undoubtedly correct; a property, at the time of the writ brought, not at the time of the stoppage; and the jury might well find that the plaintiff, having stopped the goods, and revested in himself a right of possession till the price was paid, had a special property in them,. as the rule required.

It is contended that there is no evidence upon which the jury could be justified in finding the insolvency of Murcheson & Co.; but we think otherwise. The evidence of the contract, of the sending the goods, and the bill, tend to show that they were regarded by the plaintiff as solvent. The proof that they did not pay the bill, that they got possession of the goods without payment, and that no such parties could be found afterward, was competent evidence, from which the jury might find their insolvency, as well as their entire failure to perform the condition of the sale.

Objection is made to the general terms used by the judge in relation to the proceedings of the agents of the railroad, but we are unable to understand this language as importing that the carriers would be liable in any other case except that they had conducted improperly in surrendering the property to the consignees, to the

prejudice of the plaintiffs' rights, and to such an instruction no just exception can be taken.

As the freight for the conveyance of the property from Dover had been paid by the party who was expected to pay it, and the carriers had no further claim on that account, it was not necessary to make any tender to them.

*Judgment on the verdict.*